No. 102,342

STATE OF KANSAS, *Appellee*, v. JOSEPH MORALEZ, *Appellant*.

(300 P.3d 1090)

398

Opinion filed May 17, 2013.

*Michael J. Bartee*, of Michael J. Bartee, P.A., of Olathe, argued the cause and was on the brief for appellant.

*Jason E. Geier*, assistant district attorney, argued the cause, and *Natalie Chalmers*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: During what began as a voluntary encounter, two law enforcement officers retained Joseph Moralez' identification card and detained him while conducting a warrants check, all without any reasonable suspicion of criminal activity by Moralez. After discovering an outstanding warrant for Moralez, officers arrested Moralez and seized marijuana from his pocket. The State charged Moralez with felony possession of marijuana, and Moralez sought to suppress the marijuana as the fruit of an unlawful detention. The district court denied the motion and subsequently convicted Moralez as charged. On direct appeal, a divided panel of the Court of Appeals affirmed the district court's suppression ruling and Moralez' conviction. *State v. Moralez*, 44 Kan. App. 2d 1078, 242 P.2d 223 (2010), *rev. granted* 292 Kan. 968 (2011). We granted Moralez' petition for review under K.S.A. 20-3018(b), obtaining jurisdiction under K.S.A. 60-2101(b).

We conclude the officers unlawfully detained Moralez when they retained his identification card and ran a warrants check without reasonable suspicion of his involvement in criminal activity. Further, we clarify our opinion in *State v. Martin*, 285 Kan. 994, 179 P.3d 457, *cert. denied* 555 U.S. 880 (2008), regarding the effect of the discovery of an outstanding arrest warrant during an unlawful detention. Ultimately, we hold that under the facts of this case, the officers' discovery of Moralez' outstanding arrest warrant did not sufficiently purge the taint of his unlawful detention. Accordingly, we reverse the Court of Appeals' decision affirming the sup-

pression ruling, reverse the district court's suppression ruling, reverse Moralez' conviction, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

We have summarized below the hearing testimony of the arresting officer and the defendant.

*Officer Whisman's Testimony*

Around 2:48 a.m., patrolling Topeka Police Officer Damon Whisman stopped at an apartment complex parking lot to investigate an unoccupied and legally parked car with its headlights on. As he did so, the headlights automatically turned off. In the meantime, Whisman noticed the car's 30-day license tag had expired. At some point, Topeka Police Officer Mark Hilt arrived in a separate patrol car.

According to Whisman, the encounter with Moralez began when Moralez called down to Whisman from a second-floor apartment balcony and asked Whisman what was going on. Whisman did not recall whether he asked Moralez to come downstairs; in any event, Moralez went downstairs and joined the officers because either "[Whisman] was having a hard time hearing [Moralez] or [Moralez] was having a hard time hearing [Whisman]."

Whisman asked Moralez who owned the vehicle, and Moralez identified an acquaintance, Melody Legate, as its owner. Whisman testified he did not recall whether Moralez offered to go and get Legate. Ultimately, Hilt contacted Legate and Legate also joined the officers.

According to Whisman, Moralez remained in the area while officers spoke with Legate, but the officers did not include him in their conversation with Legate. Whisman testified he requested Moralez' identification at some point during Whisman's conversation with Legate because he "[j]ust want[ed] to document who [he] talked to." According to Whisman, Moralez provided a Kansas identification card and Legate provided a Kansas driver's license. Although Whisman admitted he did not suspect Moralez or Legate of committing any offenses, he requested that dispatch run both of their identifications to check for outstanding warrants.

When dispatch advised Whisman of a possible warrant for Moralez, Whisman instructed Moralez to remain there until Whisman could confirm the warrant. Whisman testified this was the only time he instructed Moralez to stay in the area, but he could not recall whether Moralez attempted to leave the area before being instructed to remain. Dispatch ultimately confirmed that Moralez had an outstanding warrant. Whisman arrested Moralez at 3:04 a.m. and asked Moralez if he had anything on him. Moralez admitted he had a small bag of marijuana in his pocket, and Whisman seized the marijuana.

*Moralez' Testimony*

Moralez testified his contact with the officers began when he went downstairs to get cigarettes from Legate's vehicle, saw the two police officers standing in the parking lot, and asked them what was going on. After identifying Legate as the owner of the vehicle with an expired tag, Moralez offered to go back into the apartment to get Legate, but Legate already was coming downstairs.

Moralez testified he heard the officers talking to Legate about the expired tag, but Moralez believed he was free to leave at that point because the conversation did not include him. He started to return to the apartment when the officers "asked [him] again not to go anywhere." Moralez testified he believed he was free to leave even after the officers told him not to go inside, but he chose not to do so out of respect for law enforcement. According to Moralez, when he asked the officers why they asked him not to go anywhere, "they said they wanted to run names or something," and they asked for his name.

*Suppression Motion and the District Court's Ruling*

After the State charged Moralez with felony possession of marijuana, he moved to suppress the marijuana and his postarrest admission that he possessed marijuana. The State argued the encounter was voluntary because Moralez felt free to leave, but Moralez countered that regardless of his subjective belief that he was free to leave, objectively he was not free to leave because the officers instructed him to remain in the area. Moralez urged the district court to distinguish this court's ruling in *Martin*, arguing

"the finding of the warrant was a direct consequence of an unlawful detention because [the officers] didn't have any real reason to stop him."

Focusing on Moralez' testimony that he felt free to leave, the district court concluded the encounter was voluntary and denied Moralez' suppression motion. Alternatively, the court found *Martin* indistinguishable and concluded the discovery of Moralez' outstanding arrest warrant purged the taint of any unlawful conduct by the officers. Ultimately, the district court found Moralez guilty as charged and imposed a prison sentence of 13 months but suspended the sentence and ordered Moralez to serve 12 months' probation.

*Court of Appeals' Decision*

On direct appeal, a divided panel of the Court of Appeals affirmed the suppression ruling and Moralez' conviction. *Moralez*, 44 Kan. App. 2d 1078. Citing deficiencies in the record, the majority declined to decide whether the officers unlawfully detained Moralez. 44 Kan. App. 2d at 1084-85. Instead, the majority applied *Martin* to conclude "that even if Moralez was unlawfully detained, the subsequent discovery of the arrest warrant purged the taint of the unlawful detention." *Moralez*, 44 Kan. App. 2d at 1085, 1088-90.

In a dissenting opinion, Judge Atcheson concluded the officers unlawfully detained Moralez when Whisman "physically took possession of the identification card to run the warrant check." 44 Kan. App. 2d at 1097-100 (Atcheson, J., dissenting). Judge Atcheson strongly criticized *Martin* but ultimately concluded this court's analysis in *Martin* did not support attenuation under the facts of this case. *Moralez*, 44 Kan. App. 2d at 1093-94, 1100-30.

We granted Moralez' petition for review to consider two issues: (1) Whether Moralez was unlawfully detained, and (2) if so, whether the officers' discovery of an outstanding arrest warrant sufficiently purged the taint of the unlawful detention.

### Moralez' Voluntary Encounter with Officers Evolved into an Unlawful Detention When Whisman Retained Moralez' Identification Card and Detained Him While Running a Warrants Check.

Moralez argues officers seized him when, after clearing him of involvement in the illegally registered car, they requested his identification and retained it to run a warrants check. Moralez cites several additional factors he contends support his claim of an unlawful detention, including the presence of two officers, the officers' demand that he remain in the area after he made clear he wanted to leave, the officers' failure to inform him that he could leave, and his inability to leave after the officers took his identification card.

The State contends the interaction between Moralez and the two officers began as a voluntary encounter and remained voluntary at least until officers learned Moralez had a possible outstanding warrant. In support, the State emphasizes the lack of evidence that officers exhibited a show of authority, the brief nature of the encounter, and Moralez' testimony that he felt free to leave.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 15 of the Kansas Constitution Bill of Rights provides the same guarantee. See *State v. Thompson*, 284 Kan. 763, 772, 779-80, 166 P.3d 1015 (2007).

"[A] person is seized, thereby triggering a Fourth Amendment analysis of the police action, 'when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' " *State v. Morris*, 276 Kan. 11, 17, 72 P.3d 570 (2003) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 [1968]). If no physical force is involved, a seizure by show of authority occurs when the totality of circumstances surrounding the incident would communicate to a reasonable person that he or she is not free to leave and the person submits to the show of authority. *Morris*, 276 Kan. at 18-19.

Even a brief seizure must be "reasonable" under the Fourth Amendment. See, *e.g.*, *Thompson*, 284 Kan. at 773 (a traffic stop

"is considered a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief' "). A brief, investigatory detention, also known as a *Terry* stop, is constitutional and statutorily permitted if " 'an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime.' [Citations omitted.]" *State v. Thomas*, 291 Kan. 676, 687, 246 P.3d 678 (2011) (quoting *State v. Pollman*, 286 Kan. 881, 889, 190 P.3d 234 [2008]); see also K.S.A. 22-2402(1) ("Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand of the name, address of such suspect and an explanation of such suspect's actions.").

In contrast, voluntary encounters are not considered seizures and do not trigger the protections of the Fourth Amendment. See *Pollman*, 286 Kan. at 887; *Morris*, 276 Kan. at 19.

" '[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.' " *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) (quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 [1983]).

Similarly, a voluntary encounter is not automatically transformed into a seizure when an individual who has been approached and questioned by an officer voluntarily responds to the officer's questions or request for identification. See *INS v. Delgado*, 466 U.S. 210, 216, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."); *United States v. Laboy*, 979 F.2d 795, 798 (10th Cir. 1992) ("A voluntary encounter involves the voluntary cooperation of a citizen with noncoercive questioning."); see also *State v. Lee*, 283 Kan. 771, 775-78, 156 P.3d 1284 (2007) (concluding a voluntary encounter did not evolve into an investigatory detention "simply because the of-

ficer asked Lee for permission to conduct a pat-down search for weapons" and the defendant "chose to voluntarily comply" with the officer's request).

But, under some circumstances, what begins as a voluntary encounter can evolve into a seizure.

"To determine if this evolution has occurred, the United States Supreme Court has devised a 'totality of the circumstances' test. Under the test, law enforcement interaction with a person is voluntary, not a detention, if under the totality of the circumstances an officer's conduct conveys to a reasonable person that he or she is free to refuse the officer's requests or otherwise end the encounter. [Citations omitted.]" *Pollman*, 286 Kan. at 887.

We have delineated several nonexclusive factors to consider in applying this test: "the presence of more than one officer, the display of a weapon, physical contact by the officer, use of a commanding tone of voice, activation of sirens or flashers, a command to halt or approach, and an attempt to control the ability to flee." *State v. McGinnis*, 290 Kan. 547, 553, 233 P.3d 246 (2010). " '[N]o one factor is legally determinative, dispositive, or paramount. The outcome does not turn on the presence or absence of a single controlling or infallible touchstone and requires careful scrutiny of all the surrounding circumstances.' [Citation omitted.]" 290 Kan. at 553 (quoting *Thompson*, 284 Kan. 763, Syl. ¶ 20).

Turning now to the facts of this case, we first consider whether, under the totality of the circumstances, a reasonable person in Moralez' position would have felt free to disregard the officers' questions, to decline the officer's request for identification, or to otherwise terminate the encounter. Contrary to the district court's conclusion, Moralez' subjective belief that he was free to leave is not determinative of this question. Instead, we apply an objective reasonable person standard and, while relevant, Moralez' testimony that he subjectively believed he was free to leave is not dispositive.

We conclude, as did the district court, that Moralez' contact with the officers began as a voluntary encounter. Moralez testified he went downstairs to get his cigarettes, saw the two officers, and asked them what was going on. Whisman testified Moralez called down to Whisman from an apartment balcony, asked what was

going on, and later joined Whisman and Hilt near the car with the expired tag. Under either scenario, Moralez voluntarily initiated contact with the officers.

But to determine whether this voluntary encounter remained voluntary, we shift our focus to the officer's request for and retention of the defendant's identification.

The district court and the Court of Appeals majority concluded the encounter between Whisman and Moralez remained voluntary even after the officer requested and retained Moralez' identification card. Judge Atcheson, on the other hand, identified the point at which the encounter evolved into an unlawful detention as the point at which Whisman physically took possession of Moralez' identification card, reasoning that a reasonable person would not have felt free to leave without his or her identification card. *Moralez*, 44 Kan. App. 2d at 1097-100 (Atcheson, J., dissenting).

We have recognized that a law enforcement officer's mere request for identification or identifying information generally will not constitute a seizure. See *Pollman*, 286 Kan. at 888; *State v. McKeown*, 249 Kan. 506, 509, 819 P.2d 644 (1991) (recognizing generally that an officer may, without reasonable suspicion, approach an individual on the street and "request identification but cannot force the individual to answer").

In contrast, we have held that an officer's *retention* of an individual's identification "may, *absent offsetting circumstances*, mean a reasonable person would not feel free to leave without his or her license." (Emphasis added.) *Pollman*, 286 Kan. at 889. Thus, in *Pollman* we held that an officer's retention of identification is one factor to be considered in applying the totality of circumstances test. See also *United States v. Guerrero*, 472 F.3d 784, 786-87 (10th Cir. 2007) (noting that mere examination of one's driver's license does not constitute detention, but "once the officers take possession of that license, the encounter morphs into a detention"); *United States v. Lopez*, 443 F.3d 1280, 1285-86 (10th Cir. 2006) (concluding officer unlawfully detained defendant by retaining his license longer than necessary to confirm his identify when officer approached defendant in a high-crime area late at night, requested his identification and took defendant's license to patrol car to con-

duct warrants check); *United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995) (concluding that voluntary encounter, including request to examine identification, became investigative detention when agents received defendant's driver's license and did not return it to him).

Here, although the record does not clearly delineate the sequence of events during the encounter, it is undisputed that at some point Whisman obtained Moralez' identification card because Whisman "[j]ust want[ed] to document who [he] talked to."

Moreover, we cannot discern from the record how long Whisman retained Moralez' identification card. But, as in *Lopez*, we know he did so longer than necessary to "document" speaking with Moralez. And, we know that Whisman retained Moralez' identification while he conducted the warrants check despite lacking any suspicion that Moralez was engaged in any criminal activity. *Cf. State v. Walker*, 292 Kan. 1, 14-16, 251 P.3d 618 (2011) (noting that when law enforcement officer has reasonable suspicion to detain and investigate pedestrian, it is constitutionally permissible for officer to obtain pedestrian's identification and check for outstanding warrants).

Under these circumstances, we conclude Whisman seized Moralez when Whisman requested and took possession of Moralez' identification card and then retained it while running a check for outstanding warrants. Further, because Whisman did not suspect Moralez of involvement in any criminal activity, the seizure was unlawful.

Given this violation of Moralez' Fourth Amendment right to freedom from unreasonable seizures, we next consider whether the exclusionary rule requires suppression of the evidence obtained in violation of that right.

### THE OFFICERS' DISCOVERY OF MORALEZ' OUTSTANDING ARREST WARRANT DID NOT PURGE THE TAINT OF THE UNLAWFUL DETENTION.

When a criminal defendant challenges the State's use of evidence allegedly obtained in violation of the defendant's Fourth Amendment rights, the State bears the burden to establish the

lawfulness of the challenged search or seizure. *McGinnis*, 290 Kan. at 551. When the State fails to meet that burden, the evidence may be suppressed through application of the exclusionary rule. See *Herring v. United States*, 555 U.S. 135, 140-48, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (explaining limits and purposes of exclusionary rule); *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (explaining fruit of poisonous tree doctrine); *State v. Deffenbaugh*, 216 Kan. 593, 598, 533 P.2d 1328 (1975) (describing fruit of poisonous tree doctrine as "one facet of the exclusionary rule" and explaining that doctrine is held "to extend the scope of the exclusionary rule to bar not only evidence directly seized, but also evidence indirectly obtained as a result of information learned or leads obtained in the unlawful search").

The primary purpose of the exclusionary rule is to deter unlawful conduct. But " 'the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons.' [Citations omitted.]" *Brown v. Illinois*, 422 U.S. 590, 599-600, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (quoting *United States v. Calandra*, 414 U.S. 338, 94 S. Ct. 613, 38 L. Ed. 2d 561 [1974]); see *Herring*, 555 U.S. at 144 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it . . . . [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.").

One recognized exception to the exclusionary rule is the doctrine of attenuation. "Under the attenuation doctrine, courts have found that the poisonous taint of an unlawful search or seizure dissipates when the connection between the unlawful police conduct and the challenged evidence becomes attenuated." *State v. Martin*, 285 Kan. 994, 1003, 179 P.3d 457, *cert. denied* 555 U.S. 880 (2008) (citing *Nardone v. United States*, 308 U.S. 338, 60 S. Ct. 266, 84 L. Ed. 307 [1939]). When evidence " 'would not have come to light but for the illegal actions of the police,' " the relevant question is whether officers discovered the allegedly tainted evidence through " 'exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Brown*, 422 U.S. at 599 (quoting *Wong Sun*, 371 U.S. at 487-88).

To answer that question, courts generally consider (1) the time that elapsed between the illegal conduct and the acquisition of the evidence sought to be suppressed, (2) the presence of any intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04; see *Martin*, 285 Kan. at 1003. But no one factor is controlling, and other factors also may be relevant to the attenuation analysis. See, *e.g.*, *Brown*, 422 U.S. at 600-04 (concluding that giving of *Miranda* warnings, standing alone, cannot support attenuation where confession follows unlawful arrest; but noting that giving *Miranda* warnings is relevant factor to consider in determining whether confession was sufficiently attenuated from unlawful arrest); *Martin*, 285 Kan. at 1003 (noting that no single factor is dispositive).

*Standard of Review*

Whether attenuation sufficiently purged the taint of illegal police conduct is a question of fact we review under a substantial competent evidence standard. See *State v. Smith*, 286 Kan. 402, 420, 184 P.3d 890, *cert. denied* 555 U.S. 1062 (2008) (whether causal break dissipated taint of unlawful seizure is question of fact).

*Attenuation and* State v. Martin

Here, both parties agree that *Martin* outlines the appropriate framework for applying the attenuation doctrine. The parties disagree, however, as to whether application of that framework requires that we find the discovery of Moralez' outstanding arrest warrant sufficiently attenuated his unlawful detention from the discovery of marijuana in Moralez' pocket.

In *Martin*, the State did not seek review of the issue of whether Martin was detained, legally or otherwise, at the time of the warrants check. Instead, this court presumed law enforcement officers unlawfully detained Martin when they approached him without reasonable suspicion of criminal activity as he stood near a street, asked him for identification, ran a warrants check, discovered an outstanding warrant, arrested him, and ultimately discovered marijuana leading to a drug possession conviction.

Consequently, in *Martin*, we explicitly "restrict[ed] our analysis to the question [of] whether the discovery of an outstanding arrest

warrant during an unlawful detention is an intervening event which removes the taint of the unlawful detention from evidence retrieved in a search incident to the warrant arrest." 285 Kan. at 998. The parties in *Martin* proposed conflicting answers to this question, each relying upon seemingly inconsistent decisions from this court: *State v. Jones*, 270 Kan. 526, 17 P.3d 359 (2001), and *State v. Damm*, 246 Kan. 220, 787 P.2d 1185 (1990). Although the facts in *Jones* and *Damm* involved vehicle stops while the facts in *Martin* did not, the court attempted to reconcile the two decisions and apply a unified analysis to the police/citizen encounter presented in *Martin*.

While we need not reiterate the facts of *Jones* and *Damm* here, we do reiterate an essential distinction drawn in *Martin*. There, we concluded, as a matter of law, that an arrest made pursuant to an outstanding warrant is not invalidated by a prior unlawful detention. But we also concluded that evidence discovered following an unlawful detention may be subject to the exclusionary rule even if discovered pursuant to an arrest on an outstanding warrant. *Martin*, 285 Kan. at 1002.

In *Martin*, we articulated and applied a three-factor test to determine whether evidence discovered after an unlawful detention is subject to the exclusionary rule. As stated above, under that test, we consider (1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. 285 Kan. at 1003 (citing *Brown*, 422 U.S. at 603-04).

Applying the *Brown* factors to the circumstances in *Martin*, we concluded the first factor "weigh[ed] heavily" against the State because of the lack of a temporal break between Martin's unlawful detention and the discovery of the marijuana. Regarding the second factor, we concluded the "lawful warrant arrest . . . and ensuing lawful search incident to arrest represent[ed] *a potential break* in the causal chain" between the unlawful detention and the discovery of the marijuana. (Emphasis added.) 285 Kan. at 1004. Despite this somewhat ambiguous language, we ultimately characterized the outstanding arrest warrant more definitively as an "intervening

circumstance," which presumably weighed in favor of the State. 285 Kan. at 1005.

In analyzing the third factor in *Martin*, we commented: "The third factor—the purpose and flagrancy of the official misconduct—dovetails with the second factor." 285 Kan. at 1004. We then concluded the officers did not act flagrantly in unlawfully detaining the defendant because there was no evidence the officers contacted Martin to search for contraband, their conversation with Martin was brief, and Martin was cooperative. 285 Kan. at 1003-04.

We ultimately concluded: "[C]onsidering the minimal nature and extent of the official misconduct, the outstanding arrest warrant was an intervening circumstance which sufficiently attenuated the taint of the unlawful detention so as to permit the admission of the fruits of the search incident to arrest." *Martin*, 285 Kan. at 1004-05.

Thus, in *Martin* we implied that the discovery of an outstanding arrest warrant may be sufficient on its own to constitute an intervening circumstance weighing in favor of the State under the second factor of the attenuation analysis. Further, regarding the third factor, we focused on the initial justification for the officers' presence in the area of the eventual stop (in *Martin*, officers responded to a report of a man urinating in public). In commenting that this third factor "dovetails" with the second factor, we seemingly suggested that the third factor also will weigh in favor of the State as long as officers possess some initial justification for the pedestrian/citizen encounter, the defendant cooperates with the officers, and officers detain the defendant only briefly.

Unsurprisingly, in arguing both the second and third factor weigh in its favor here, the State relies heavily on this broad reading of *Martin* and argues the facts of this case are highly analogous to those before the court in *Martin*. Specifically, the State points to the innocuous basis for the officers' presence in the area—*i.e.*, the observation of a vehicle with its lights on and the subsequent discovery of an expired tag; the lack of any nefarious intent on the part of the officers; the discovery of an outstanding warrant; and the officers' brief and cooperative conversation with Moralez.

Moralez points out that *Martin* held that the discovery of an arrest warrant would not always purge the taint of an unlawful detention. But Moralez contends *Martin*'s practical application has produced the opposite result, permitting officers to violate the Fourth Amendment with impunity. Moralez argues that as long as there is any justification for officers' initial presence in the area of defendant's arrest and officers eventually discover an arrest warrant, *Martin* permits officers to use evidence seized pursuant to the arrest, despite officers' unlawful conduct. Moralez encourages us to narrowly interpret *Martin* and discourage such a result.

*Clarification of* State v. Martin

We agree with Moralez that the practical application of *Martin* produces a result we did not intend when we decided *Martin*. Accordingly, we take this opportunity to revisit and clarify our holding in *Martin*. In doing so, we have reviewed several cases from other jurisdictions applying *Brown*'s attenuation analysis in similar situations.

Our review of these cases reveals that most jurisdictions have determined that the discovery of an arrest warrant during an unlawful detention is a relevant intervening circumstance for attenuation purposes but is not independently sufficient to purge the taint of an unlawful detention. See, *e.g.*, *United States v. Gross*, 662 F.3d 393, 396-406 (6th Cir. 2011) (reasoning "where there is a stop with no legal purpose, the discovery of a warrant during that stop may be a relevant factor in the intervening circumstance analysis, but it is not by itself dispositive"); *People v. Brendlin*, 45 Cal. 4th 262, 271, 85 Cal. Rptr. 3d 496, 195 P.3d 1074 (2008) (concluding that "case law uniformly holds that an arrest under a valid outstanding warrant—and a search incident to that arrest—is an intervening circumstance that tends to dissipate the taint caused by an illegal traffic stop"), *cert. denied* 129 S. Ct. 2008 (2009); *State v. Strieff*, 286 P.3d 317, 326 n.8 (Utah App. 2012) (gathering cases and concluding that most jurisdictions have "universally treated the discovery of an arrest warrant as an intervening circumstance").

However, in *Jones*, we relied on several cases that seemingly took the position that the discovery of an outstanding arrest warrant

would automatically dissipate the taint of a preceding unlawful detention. *Jones*, 270 Kan. at 527-29. Specifically, we quoted *United States v. Green*, 111 F.3d 515, 521 (7th Cir.) (" 'It would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant.' "), *cert. denied* 522 U.S. 973 (1997); and *People v. Murray*, 312 Ill. App. 3d 685, 691-92, 728 N.E. 2d 512 (2000) (" 'It would be illogical and nonsensical for us to hold that once the police illegally stop an automobile, they can never arrest an occupant who is found to be wanted on a warrant.' "). Further, we cited *State v. Hill*, 725 So. 2d 1282, 1286-87 (La. 1998), for the proposition "that the discovery of an outstanding arrest warrant constitutes an 'intervening circumstance' which dissipates the taint of an initial impermissible encounter," because "law enforcement officers would be derelict in their duty not to arrest the defendant once they learn of the outstanding arrest warrant." *Jones*, 270 Kan. at 527-29.

We now recognize that in *Jones* we failed to distinguish between the lawfulness of an arrest based on an outstanding warrant discovered during an unlawful detention and the taint of the unlawful detention that may apply to evidence discovered pursuant to the lawful arrest. In *Martin*, we compounded this error by over-emphasizing the discovery of the outstanding warrant and the lawfulness of the arrest based on the warrant. We reasoned:

"The second factor . . . brings the outstanding arrest warrant into play. Under that circumstance, the law enforcement officer was put on notice that a court had determined there was probable cause to believe that Martin had committed a crime and that the court had issued an order for law enforcement to take Martin into custody. The warrant arrest of Martin was a lawful, perhaps mandatory act. Thereupon, K.S.A. 22-2501 permitted, and officer safety recommended, that the officer search Martin's person. Thus, the lawful warrant arrest for a prior crime, and ensuing lawful search incident to arrest, represent a potential break in the causal chain between the unlawful conduct of illegally detaining Martin and the retrieval of the challenged evidence." *Martin*, 285 Kan. at 1003-04.

To the extent that *Martin* or *Jones* have been or can be read to suggest that the discovery of an outstanding arrest warrant *always* constitutes an intervening circumstance that dissipates any taint,

we now expressly disapprove that interpretation. Stated more succinctly, the preceding unlawful detention does not taint the lawful arrest on the outstanding warrant, nor does it prevent the officer from conducting a safety search pursuant to that arrest; but it does taint any evidence discovered during the unlawful detention or during a search incident to the lawful arrest.

Were it otherwise, law enforcement officers could randomly stop and detain citizens, request identification, and run warrants checks despite the lack of any reasonable suspicion to support the detention, knowing that if the detention leads to discovery of an outstanding arrest warrant, any evidence discovered in the subsequent search will be admissible against the defendant in a criminal proceeding unrelated to the lawful arrest.

In this regard, we agree with the conclusion of the Arizona Supreme Court in applying the second *Brown* factor: "[T]he subsequent discovery of a warrant is of minimal importance in attenuating the taint from an illegal detention upon evidence discovered during a search incident to an arrest on the warrant." See *State v. Hummons*, 227 Ariz. 78, 81, 253 P.3d 275 (2011); see also *People v. Mitchell*, 355 Ill. App. 3d 1030, 1031-38, 824 N.E.2d 642 (officers detained defendant at 5 a.m. as he walked in his residential neighborhood, and after discovering outstanding warrant, arrested him and discovered cocaine in search incident to arrest; appellate court affirmed suppression, reasoning in part that suppression "appears to be the only way to deter the police from randomly stopping citizens for the purpose of running warrant checks"), *appeal denied* 215 Ill. 2d 611 (2005).

Finally, we acknowledge that at least some of *Martin's* reasoning regarding the third factor—the purpose and flagrancy of the police misconduct—is contrary to the rationale of *Brown*. In discussing the purposefulness of an illegal arrest, the *Brown* Court emphasized that "[t]he arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up." *Brown*, 422 U.S. at 605; see also *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (noting that purposeful and flagrant conduct has been found where impropriety of official's misconduct is obvious

or official knowingly engaged in likely unconstitutional behavior and misconduct was investigatory in design and purpose with " 'the hope that something might turn up' "). Again, we agree with the Arizona Supreme Court that the "purpose and flagrancy of illegal conduct, the third *Brown* factor . . . goes to the very heart and purpose of the exclusionary rule," and we adopt *Hummons'* clarification of some of the factors to be considered in applying the third attenuation factor:

"Factors such as an officer's regular practices and routines, an officer's reason for initiating the encounter, the clarity of the law forbidding the illegal conduct, and the objective appearance of consent may all be important in this inquiry. By focusing on officer conduct, courts may distinguish between ordinary encounters that happen to devolve into illegal seizures and intentional illegal seizures for the purpose of discovering warrants." 227 Ariz. at 81-82.

In applying the third factor, we also note that when law enforcement officers approach random citizens, request identification, and run warrants checks for no apparent reason, the officers clearly are performing investigatory detentions designed and executed in the hope that something might turn up. Though some have understood us to condone this practice in *Martin*, we now expressly disapprove of any language in *Martin* that could be interpreted as holding or suggesting that "fishing expeditions" by law enforcement officers are generally acceptable as long as the detention is brief and the officers are courteous. See *Martin*, 285 Kan. at 1004. In fact, quite the opposite may be true. Regardless of whether a suspicionless detention to identify a citizen and check that citizen for outstanding arrest warrants is characterized as a standard practice, a field interview, a pedestrian check, or a "fishing expedition," such a detention can, and often will, demonstrate at least some level of flagrant police conduct.

Accordingly, we reaffirm today that when evidence is discovered after an unlawful detention and discovery of an arrest warrant, the framework articulated in *Martin* applies. But we clarify that the three factors generally considered in performing an attenuation analysis—temporal proximity, presence of intervening circumstances, and purpose and flagrancy of police misconduct—are not exclusive, nor are they necessarily entitled to equal weight. Instead,

consideration of all relevant factors will necessarily depend on the particular facts presented in each case.

*Application of* State v. Martin *as Clarified*

Returning to the facts of this case, we find that the first *Brown* factor weighs heavily in favor of suppression because the discovery of the challenged evidence occurred within 16 minutes of Moralez' initial contact with the officers. Regarding the second factor, we find the discovery of the outstanding arrest warrant of minimal importance, neither weighing in favor of nor against suppression. Because the first factor weighs heavily in favor of suppression and the second factor essentially is neutral, the outcome of the attenuation analysis in this case necessarily turns on the third factor— the purpose and flagrancy of Whisman's conduct.

Moralez argues Whisman's conduct was purposeful and flagrant because "the officer's goal in detaining Moralez, who was suspected of nothing illegal, was to check him for warrants, and, inevitably, if a warrant was found, to arrest and search him."

We agree with the district court that Whisman's actions in this case initially were not flagrant. Significantly, the officers here did not approach Moralez as he was walking or riding his bicycle and detain him for no apparent reason. Instead, as the officers investigated a car in the parking lot with its lights on which displayed an expired tag, Moralez came out on his balcony and asked them what was going on. After providing the officers with the name of the car's owner, Moralez remained in the area, although it is unclear whether he remained on his own accord or at the direction of the officers. *Cf. Mitchell*, 355 Ill. App. 3d at 1035-38 (two law enforcement officers conducted suspicionless warrant check of defendant after stopping him for no reason as he walked through his neighborhood); *State v. Soto*, 143 N.M. 631, 636-37, 179 P.3d 1239 (2008) (two law enforcement officers stopped defendant for no reason and conducted suspicionless warrant check as he rode his bicycle on a city street).

But in applying the third factor of the attenuation analysis, we are reminded that Moralez' actions are less important than the actions of the law enforcement officer, who acted as an agent of

the State and was bound not only to uphold the law, but to follow the law. The third factor of the attenuation analysis focuses on the primary purpose of the exclusionary rule—deterrence. See *Herring*, 555 U.S. at 144 ("[t]o trigger the exclusionary rule, police conduct must be sufficiently· deliberate that exclusion can meaningfully deter it"). Further, the purpose of the exclusionary rule is to deter law enforcement officers from acting in contravention of the Fourth Amendment, not to deter citizens from acting in contravention of their own best interests.

Here, the record demonstrates no legitimate purpose for Whisman's decision to run a warrants check on Moralez after Whisman verified that Moralez did not own the car with the expired tag. Instead, the record reveals the State offered only one basis for Whisman's actions—*i.e.*, Whisman requested Moralez' identification to "document" who he talked to. But it is obvious that Whisman's action in running a warrants check on Moralez exceeded his stated purpose of "documenting" who he talked to and could more accurately be characterized as an investigatory detention.

Likewise, it is well established—and certainly well known to law enforcement officers—that an investigatory detention must be supported by reasonable suspicion. See K.S.A. 22-2402(1); *State v. Thomas*, 291 Kan. 676, 687, 246 P.3d 678 (2011); see also *State v. Walker*, 292 Kan. 1, 14-16, 251 P.3d 618 (2011) (when law enforcement officer has reasonable suspicion to detain and investigate pedestrian, it is constitutionally permissible for officer to obtain pedestrian's identification and check for outstanding warrants).

So although we conclude Whisman's initial actions were not flagrant, we find he acted flagrantly in retaining Moralez' identification for the stated purpose of "documenting" who he talked to, and then exceeding that purpose by conducting a warrants check absent any suspicion whatsoever of criminal activity. In doing so, Whisman did more than round out his police report, he conducted an investigatory detention with no suspicion of unlawful activity. Under these circumstances, we conclude the third factor of the *Brown* attenuation analysis weighs slightly in favor of suppression here.

To summarize our conclusions regarding the attenuation analysis, we hold that the first factor—the short time between Moralez' initial contact with police and the discovery of the marijuana—weighs heavily in favor of Moralez, while the second factor—the presence of intervening circumstances—essentially is neutral under the circumstances of this case. Therefore, our conclusion regarding the third factor and the flagrancy of the officer's conduct tips the balance in favor of Moralez and requires application of the exclusionary rule in this case. Accordingly, we reverse the Court of Appeals' decision affirming the district court's suppression ruling, we reverse the district court's suppression ruling and reverse Moralez' conviction, and we remand for further proceedings.

Reversed and remanded for further proceedings consistent with this opinion.