No. 119,520

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

RICHARD WILLIAM MANWARREN II,
*Appellee*.

SYLLABUS BY THE COURT

1.

When the material facts supporting the district court's decision on a motion to suppress evidence are not in dispute, the ultimate question of whether to suppress the evidence is a question of law over which an appellate court has unlimited review.

2.

Kansas courts have recognized four types of police-citizen encounters: voluntary encounters, investigatory detentions or *Terry* stops, public safety stops, and arrests.

3.

The legality of a public safety stop can be evaluated in three steps. First, as long as there are objective, specific, and articulable facts from which a law enforcement officer would suspect that a citizen needs help or is in peril, the officer has the right to stop and investigate. Second, if the citizen needs aid, the officer may take appropriate action to render assistance. Third, once the officer is assured that the citizen is not in peril or is no longer in need of assistance, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment to the United States Constitution.

1

4.

In applying the public safety rationale to justify a police-citizen encounter, courts employ careful scrutiny so the protections of the Fourth Amendment are not emasculated. A public safety stop is not for investigative purposes. A public safety stop must be divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

5.

The Kansas Supreme Court has held that a law enforcement officer's mere request for identification or identifying information generally will not constitute a seizure. But an officer's *retention* of an identification card is one factor to be considered in applying the totality of the circumstances test, and that factor may, absent offsetting circumstances, mean a reasonable person would not feel free to leave or otherwise terminate an encounter with the officer.

6.

Under the facts of this case, what began as a valid public safety stop evolved into an illegal detention when a law enforcement officer retained a citizen's identification card to run a warrant check after it was clear to the officer that the citizen was not in need of any help, and there was no reasonable suspicion of criminal activity to extend the scope of the encounter.

7.

The exclusionary rule is a judicially created remedy that prohibits the introduction of evidence obtained in violation of a person's constitutional rights in order to deter future violations.

8.

One exception to the exclusionary rule is the doctrine of attenuation. Under the attenuation doctrine, evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence.

9.

Under an attenuation analysis, courts generally consider (1) the time that elapsed between the illegal police conduct and the acquisition of the evidence sought to be suppressed, (2) the presence of any intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. No one factor is controlling, and other factors may also be relevant to the analysis.

10.

Whether attenuation sufficiently purged the taint of illegal police conduct is a question of fact that appellate courts review under a substantial competent evidence standard. The burden is on the State to show that the attenuation doctrine should be applied to allow the admission of the evidence.

11.

For a constitutional violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure. In examining the flagrancy of official misconduct, factors such as an officer's regular practices and routines, an officer's reason for initiating the encounter, the clarity of the law forbidding the illegal conduct, and the objective appearance of consent may all be important in this inquiry.

12.

Under the facts of this case, the district court's finding that the State failed to meet its burden of proving that the attenuation doctrine should be applied is supported by substantial evidence in the record.

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed April 12, 2019. Affirmed.

*Thomas R. Stanton*, deputy district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Shannon S. Crane*, of Hutchinson, for appellee.

Before BRUNS, P.J., MALONE and POWELL, JJ.

MALONE, J.:  The State brings this interlocutory appeal of the district court's order granting a motion to suppress evidence filed by Richard W. Manwarren II. The case involves what both parties agree began as a welfare check or public safety stop involving Manwarren and a law enforcement officer in Reno County. But after it was clear to the officer that Manwarren was not in need of any help, the officer requested and retained Manwarren's identification card to run a warrant check. When the officer discovered an outstanding warrant for Manwarren, the officer arrested him and found drugs and drug paraphernalia on his person. The district court suppressed the evidence, finding that the detention was illegal and that the State failed to meet its burden of proving that the attenuation doctrine should be applied to allow the admission of the evidence.

On appeal, the State argues that the entire encounter between Manwarren and the officer was voluntary and not a seizure; but if the encounter was an unlawful seizure, then the taint of any illegal detention was attenuated by the discovery of the unrelated and valid arrest warrants, making the evidence admissible under *Utah v. Strieff*, 579 U.S. ___,

4

136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016). For the reasons we will carefully explain in this opinion, we disagree with the State and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The facts are straightforward and undisputed. On July 17, 2016, at about 11:40 a.m., Officer Michael Rivers and another officer with the Hutchinson Police Department received a report that a man was lying in a ditch off Highway 61 in rural Reno County and might be injured. The officers responded to the call and found Manwarren lying in the grass about 5 feet from the highway. It was a bright and sunny day. As the officers arrived in their patrol car, Manwarren stood up and walked toward the officers to greet them. The parties agree that the encounter began as a welfare check, also called a public safety stop. Rivers testified that at the beginning of the encounter, there was no indication of criminal activity and Manwarren did not appear to be injured or intoxicated.

Rivers asked Manwarren whether he was okay, and Manwarren replied that he was waiting for a ride that was less than 30 minutes away. Manwarren added that he was homeless and had been camping nearby, and he was waiting for a friend to take him back into town. At that point, Rivers did not believe that Manwarren was a danger to himself or others, nor had Manwarren committed a crime by sitting by the side of the road.

Rivers then asked for Manwarren's identification "so [he] could identify who [he] was speaking with." Manwarren produced a Kansas photo ID card that included a physical description and a photograph that clearly depicted Manwarren. Then, instead of returning the identification card to Manwarren, Rivers retained the card and called dispatch to run a warrant check. Dispatch responded that Manwarren had an active warrant for "failure to appear." About five minutes had elapsed from the beginning of the encounter until dispatch informed Rivers of the outstanding warrant.

5

A third officer arrived on the scene in another patrol car. After confirming the warrant, Rivers placed Manwarren under arrest. After placing Manwarren in handcuffs, another officer asked whether Manwarren had anything the officer "should know about," and Manwarren stated that he had drugs in his pocket and scales in his backpack. Rivers searched Manwarren and the backpack and found these items. Soon thereafter, Manwarren's ride arrived at the scene. The officers allowed Manwarren's friend to take some of his personal belongings, but they seized the evidence and transported Manwarren to jail. The entire encounter was captured on Rivers' body camera.

On July 21, 2016, the State charged Manwarren with possession of methamphetamine with intent to sell, possession of drug paraphernalia with intent to distribute a controlled substance for sale, and possession of hydrocodone. Manwarren filed a motion to suppress the evidence. In the motion, Manwarren argued that his initial voluntary encounter or welfare check with the officers was converted to an investigatory detention without reasonable suspicion of criminal activity, so the evidence obtained as a result of the illegal detention must be suppressed.

The district court held a hearing on the motion to suppress on May 16, 2018. Rivers testified at the hearing and his body camera video was admitted into evidence. The State argued that the entire encounter between Manwarren and the officers was voluntary, but even if the encounter was an unlawful seizure, then the taint of any illegal detention was attenuated by the discovery of the unrelated and valid arrest warrants, making the evidence admissible under the United States Supreme Court's decision in *Strieff*.

On June 4, 2018, the district court filed an order with findings of fact and legal analysis of the issues presented in the motion to suppress. The district court found that Rivers illegally detained Manwarren to run a warrant check because it was beyond the scope of a welfare stop and there was no reasonable suspicion of criminal activity. The district court explained:

"The encounter between Officer Rivers and [Manwarren] was not consensual. [Manwarren] was not told he was free to leave or to refuse the request for his identification. [Manwarren] was on foot. Officer Rivers was in a vehicle, accompanied by a total of three other officers. A reasonable person in [Manwarren]'s position would have felt compelled to remain at the scene and to follow instructions. Officer Rivers exceeded the scope of a safety stop after he determined [Manwarren] was not in need of help. Nothing about [Manwarren] indicated impairment or a need for assistance. [Manwarren] was in a public place having apparently walked to his location. Sitting or lying down in a public place, especially when a person is on foot, and especially when a person is walking as a mode of transportation and not just for pleasure or to walk the dog, should not arouse suspicion. Officer Rivers asked [Manwarren] what his name is as the Fourth Amendment allows but when Officer Rivers asked for [Manwarren]'s identification and took it to run a warrant check the stop became an investigatory detention. Officer Rivers had no basis to formulate a reasonable suspicion that [Manwarren] was violating the law. The detention was illegal."

As for the application of the attenuation doctrine, the district court found:

"[Manwarren] was searched within minutes of the initial encounter. The time elapsed between the illegality and the acquisition of the evidence was negligible. Officer Rivers did discover an outstanding warrant, an intervening circumstance dissipating the taint of the illegal police contact. The encounter occurred on a sunny summer day in the middle of the day on a busy roadway. [Manwarren] showed respect to the officers and complied with every request made. Nothing about [Manwarren]'s appearance or conduct suggested he should be subjected to the indignity of a roadside search, visible to all passersby. The State argues *Utah v. Strieff* requires denying [Manwarren]'s motion. In the *Strieff* case the Supreme Court noted that the illegal detention occurred in connection with a bona fide investigation of a suspected drug house. Justice Thomas writing for the majority noted that the officer saw the defendant leave a suspected drug house and the officer's suspicion about the house was based on an anonymous tip and personal observations. The *Strieff* case is distinguishable. While this court has no evidence to suggest the unlawful detention was part of any systemic or recurrent police misconduct, the detention certainly did not occur in connection with a bona fide criminal investigation. The State has failed to sustain the burden of proving that the attenuation

doctrine should be applied. Because the evidence was seized as a result of an unconstitutional search, without the benefit of the attenuation doctrine the evidence must be suppressed."

Based on its findings and legal analysis, the district court granted Manwarren's motion to suppress. The State filed a timely notice of appeal. We have jurisdiction over the interlocutory appeal under K.S.A. 2018 Supp. 22-3603.

On appeal, the State claims the district court "erred in granting [Manwarren's] motion to suppress under the facts of this case." The State first argues that the entire encounter between Manwarren and the law enforcement officers was voluntary and that the district court erred when it found the detention was illegal. Second, the State contends that even if the encounter was an unlawful seizure, then the taint of any illegal detention was attenuated by the discovery of the unrelated and valid arrest warrants, making the evidence admissible under *Strieff*.

In response, Manwarren argues that his encounter with the officers was not consensual and that the district court correctly found the detention was illegal. He also argues that the attenuation doctrine should not be applied under these facts to allow the admission of the evidence.

The standard of review for a district court's decision on a motion to suppress has two parts. The appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion, however, is reviewed using a de novo standard. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). When the material facts supporting the district court's decision on a motion to suppress evidence are not in

8

dispute, the ultimate question of whether to suppress the evidence is a question of law over which an appellate court has unlimited review. 307 Kan. at 827.

## WAS MANWARREN ILLEGALLY DETAINED?

The State first argues that the entire encounter between Manwarren and the law enforcement officers was voluntary and that the district court erred when it found the detention was illegal. Conversely, Manwarren argues that his encounter with the officers was not consensual and that the district court correctly found the detention was illegal.

The district court found that, "Officer Rivers asked [Manwarren] what his name is as the Fourth Amendment allows but when Officer Rivers asked for [Manwarren]'s identification and took it to run a warrant check the stop became an investigatory detention." Because the act of running a warrant check was beyond the scope of a welfare stop and there was no reasonable suspicion of criminal activity, the district court found that Rivers illegally detained Manwarren in violation of his constitutional rights.

We begin our analysis by turning to the text of the applicable constitutional provisions. The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Section 15 of the Kansas Constitution Bill of Rights contains similar language and provides "the same protection from unlawful government searches and seizures as the Fourth Amendment." See *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014).

The rights protected by the Fourth Amendment are tested any time a law enforcement officer encounters a citizen in a public place. The rules that courts apply to safeguard the protections of the Fourth Amendment depends on the type of encounter that is involved in each particular case.

9

Kansas courts have recognized four types of police-citizen encounters. The first type is a voluntary encounter, which is not considered a seizure under the Fourth Amendment. *State v. Lee,* 283 Kan. 771, 774, 156 P.3d 1284 (2007). The second type is an investigatory detention or *Terry* stop, in which an officer may detain any person in a public place if the officer reasonably suspects that the person is committing, has committed, or is about to commit a crime. See *Terry v. Ohio,* 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); K.S.A. 22-2402(1). The third type of encounter is a public safety stop, in which an officer may approach a person to check on his or her welfare when the officer can articulate specific facts showing a concern for the public's safety. See *State v. Vistuba,* 251 Kan. 821, 824, 840 P.2d 511 (1992). The fourth type of encounter between an officer and a citizen is an arrest. See K.S.A. 22-2401.

The parties here agree that the encounter between Rivers and Manwarren *began* as a welfare check/public safety stop. The Kansas Supreme Court first recognized the concept of a public safety stop in *Vistuba,* 251 Kan. 821. In that case, the officer testified that she observed erratic driving and was concerned that the driver might be impaired, but the officer specifically stated that she suspected no criminal activity from her observations. The Supreme Court determined the stop was lawful and held: "[A] civil or criminal infraction is not always essential to justify a vehicle stop. Safety reasons alone may justify the stop, *if the safety reasons are based on specific and articulable facts.*" 251 Kan. at 824.

In *State v. Gonzales,* 36 Kan. App. 2d 446, 141 P.3d 501 (2006), this court refined the appropriate justification for a public safety stop and the limited duration and scope of such a stop. In *Gonzales,* an officer stopped the defendant's vehicle when the officer observed a "bouncy" rear tire and an open hatch over the fuel cap. After the stop, the officer immediately asked for information about ownership of the vehicle and demanded the occupants' driver's licenses, rather than examining the problematic tire. After several minutes of questioning, the driver consented to a search of the vehicle. This court upheld

10

the initial vehicle stop for public safety reasons, but this court also held the later search of the vehicle was illegal because the duration of the stop exceeded the scope of the public safety justification. 36 Kan. App. 2d at 458.

The *Gonzales* court determined that the legality of a public safety stop can be evaluated in three steps. First, as long as there are objective, specific, and articulable facts from which a law enforcement officer would suspect that a citizen needs help or is in peril, the officer has the right to stop and investigate. Second, if the citizen needs aid, the officer may take appropriate action to render assistance. Third, once the officer is assured that the citizen is not in peril or is no longer in need of assistance, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment to the United States Constitution. 36 Kan. App. 2d at 456.

In applying the public safety rationale to justify a police-citizen encounter, courts employ careful scrutiny "so the protections of the Fourth Amendment are not emasculated." *Gonzales,* 36 Kan. App. 2d at 455. A public safety stop is *not* for investigative purposes. 36 Kan. App. 2d at 457. A public safety stop "must be divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *State v. Messner*, 55 Kan. App. 2d 630, Syl. ¶ 2, 419 P.3d 642 (2018).

In *Messner*, a police officer stopped Christian Messner's vehicle after dispatch received a call reporting his odd behavior and requesting a welfare check. After stopping Messner, the police did little to check his welfare but instead seized his driver's license and checked for any warrants. This court held the officer "exceeded the limitations of the safety stop when he did more than speak with Messner to determine whether he was [all right] to drive." 55 Kan. App. 2d at 637. This court reasoned that the officer's act of taking Messner's driver's license and returning to his vehicle to run a warrant check was constitutionally impermissible, especially in light of the officer giving "no other reason for obtaining Messner's driver's license than to run it for wants and warrants." 55 Kan.

11

App. 2d at 637; see also *State v. Bluthardt*, No. 116,401, 2017 WL 948330, at *3 (Kan. App. 2017) (unpublished opinion) (holding that an officer's act of retaining a driver's license to check for warrants turns both voluntary encounters and public safety stops into investigatory detentions).

Unlike in a public safety stop, which is not for investigative purposes, it is constitutionally permissible for a law enforcement officer to obtain a person's identification and check for outstanding warrants when the officer has reasonable suspicion to detain and investigate the person for criminal activity. See *State v. Walker*, 292 Kan. 1, 14-16, 251 P.3d 618 (2011). Likewise, as part of the routine investigation of a traffic infraction, the officer has a right to check the driver's license, inspect the vehicle's registration and proof of insurance, and determine whether there are outstanding warrants against the driver. *State v. Jimenez*, 308 Kan. 315, 325, 420 P.3d 464 (2018). In other words, once an officer has legal grounds to conduct an investigatory detention, the officer is free to check the person for outstanding warrants as part of the investigation.

Returning to our facts, Rivers and another officer responded to a call to check on Manwarren's welfare. After locating Manwarren on the side of the road, Rivers asked him if he was okay, and Manwarren replied that he was waiting for a ride that was less than 30 minutes away. Manwarren added that he was homeless and had been camping nearby, and he was waiting for a friend to take him back into town. At that point, there was no indication of criminal activity and Manwarren did not appear to be injured or intoxicated.

Rivers then asked for Manwarren's identification. The Kansas Supreme Court has held that a law enforcement officer's mere request for identification or identifying information generally will not constitute a seizure. See *State v. Pollman*, 286 Kan. 881, 888, 190 P.3d 234 (2008). But in *Pollman*, the court held that an officer's *retention* of an identification card is one factor to be considered in applying the totality of the circumstances test, and that factor may, absent offsetting circumstances, mean a

12

reasonable person would not feel free to leave or otherwise terminate an encounter with the officer. 286 Kan. at 889.

Rivers had a right to ask for Manwarren's identification. But once Rivers retained the identification to run a warrant check, Manwarren was seized. At that point, no reasonable person would have felt free to leave or terminate the encounter. Based on Kansas caselaw cited above, the warrant check was beyond the scope of the welfare stop after it was clear to Rivers that Manwarren was not in need of any help. Likewise, there was no reasonable suspicion of criminal activity to extend the scope of the encounter.

The State points out that it only took Rivers a few minutes to run the warrant check and Manwarren would have remained on the side of the road waiting for his ride anyway. Although this fact may be true, it also remains true that no reasonable person would have felt free to leave or terminate the encounter once Rivers retained the identification. Rivers admitted in his testimony that it would not be "common practice" for a person to just walk away once an officer takes the person's identification. More importantly, there was no justification for Rivers to run a warrant check in the first place during a welfare stop, as such an encounter is not for investigative purposes and "must be divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Messner*, 55 Kan. App. 2d 630, Syl. ¶ 2. Even a brief seizure must be reasonable under the Fourth Amendment.

The State also points out that Manwarren never requested his identification back so he could leave, and Rivers testified that he "absolutely" would have returned it with such a request. This fact might be important if Rivers had asked for Manwarren's permission to run the warrant check and told him that he was free to deny the request. Instead, Rivers simply retained the identification to run the warrant check without giving Manwarren any say in the matter. In this situation, no reasonable person would have felt

13

free to leave or end the encounter without permission from the officer, and Manwarren would not have been expected to ask Rivers to return his identification.

Simply put, there was no justification for Rivers to run the warrant check as part of the welfare stop. Once Rivers determined that Manwarren was not in need of assistance, the welfare stop ended. By retaining Manwarren's identification and running a warrant check, the encounter became an investigatory detention even though Rivers had no reasonable and articulable suspicion that Manwarren was involved in any criminal activity. We agree with the district court that Rivers illegally detained Manwarren in violation of his constitutional rights when he retained the identification card to run a warrant check after it was clear to Rivers that Manwarren was not in need of any help.

DOES THE ATTENUATION DOCTRINE ALLOW THE ADMISSION OF THE EVIDENCE?

Because Manwarren's detention was illegal, the next question is whether the evidence should be suppressed under the exclusionary rule. The exclusionary rule is a judicially created remedy that prohibits the introduction of evidence obtained in violation of a person's constitutional rights in order to deter future violations. *State v. Baker*, 306 Kan. 585, 590, 395 P.3d 422 (2017). But there are recognized exceptions to the exclusionary rule that allow the admission of evidence initially discovered in violation of a person's constitutional rights. One such exception is known as the attenuation doctrine.

The United States Supreme Court recently explained the attenuation doctrine as follows: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' [Citation omitted.]" *Strieff*, 136 S. Ct. at 2061. Stated differently, "'[u]nder the attenuation doctrine, courts have found that the poisonous taint of an unlawful search or seizure dissipates

14

when the connection between the unlawful police conduct and the challenged evidence becomes attenuated.'" *State v. Moralez*, 297 Kan. 397, 409, 300 P.3d 1090 (2013), *abrogated by Utah v. Strieff*, 136 S. Ct. 2056.

We begin our analysis by addressing the Kansas Supreme Court's decision in *Moralez*, which arose from factual circumstances very similar to those in this case. Joseph Moralez' encounter with police began as a voluntary one, but officers obtained Moralez' identification card and, without reasonable suspicion of criminal activity, detained him while they checked for warrants. Upon discovery of an outstanding warrant for Moralez' arrest, officers arrested him and found drugs in his pocket. The State charged Moralez with felony possession of marijuana, and he moved to suppress the evidence. The district court denied the motion and a divided panel of this court affirmed. 297 Kan. at 400.

Our Supreme Court granted review to clarify its earlier opinions "regarding the effect of the discovery of an outstanding arrest warrant during an unlawful detention." 297 Kan. at 400. The court first held, under the facts of the case, that Moralez' voluntary encounter with law enforcement evolved into an unlawful detention when the officers retained Moralez' identification card and detained him while running a warrant check. 297 Kan. at 408. Next, the court held that under the facts of the case, the officers' discovery of Moralez' outstanding arrest warrant did not purge the taint of the unlawful detention. 297 Kan. at 417. In particular, the *Moralez* court held: "'[T]he subsequent discovery of a warrant is of minimal importance in attenuating the taint from an illegal detention upon evidence discovered during a search incident to an arrest on the warrant.'" 297 Kan. at 415. The *Moralez* court expressly noted:

> "Were it otherwise, law enforcement officers could randomly stop and detain citizens, request identification, and run warrants checks despite the lack of any reasonable suspicion to support the detention, knowing that if the detention leads to discovery of an

15

outstanding arrest warrant, any evidence discovered in the subsequent search will be admissible against the defendant in a criminal proceedings unrelated to the lawful arrest." 297 Kan. at 415.

We will now address in more detail the United States Supreme Court's decision in *Strieff*. The Court granted certiorari in *Strieff* to resolve disagreement on the question of applying the attenuation doctrine when an unconstitutional stop leads to the discovery of a valid arrest warrant and the later discovery of evidence. See *Strieff*, 136 S. Ct. at 2060. When it issued its opinion in 2016, the *Strieff* Court specifically cited *Moralez*, 297 Kan. at 415, as an example of cases that "assign[] little significance to the discovery of the warrant." 136 S. Ct. at 2060.

*Strieff* involved a police-citizen encounter that was an investigatory detention from the outset. While conducting intermittent surveillance of a residence identified in an anonymous tip about drug activity, Officer Douglas Fackrell saw Edward Strieff leave the residence. Believing there was reasonable suspicion that Strieff was involved in criminal activity, Fackrell stopped him in a nearby parking lot. Fackrell obtained Strieff's identification, checked with the dispatcher, and learned of an outstanding arrest warrant for Strieff. Fackrell arrested Strieff and searched him, finding drugs and drug paraphernalia.

In the resulting criminal proceedings, Strieff moved to suppress the evidence, arguing that Fackrell lacked reasonable suspicion for the stop. The district court denied the motion, finding that the existence of a valid arrest warrant sufficiently attenuated the connection between the stop and the discovery of the contraband. The Utah Court of Appeals affirmed, but the Utah Supreme Court reversed, holding that only a defendant's voluntary act could sufficiently break the connection between an illegal search and evidence subsequently discovered. The United States Supreme Court granted certiorari to

16

apply the attenuation doctrine to the facts of the case, assuming without deciding that Fackrell's initial stop was unconstitutional. 136 S. Ct. at 2060, 2062.

Citing *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), the *Strieff* Court identified three factors that guide a court's analysis of whether the attenuation doctrine applies to allow the admission of evidence discovered after a violation of a person's constitutional rights: (1) The "'temporal proximity'" between the unconstitutional conduct and the discovery of the evidence; (2) "'the presence of intervening circumstances'"; and (3) the "'the purpose and flagrancy of the official misconduct.'" 136 S. Ct. at 2061-62. No one factor is controlling, and other factors may be relevant to the attenuation analysis. See *Brown*, 422 U.S. at 603 (declining to adopt any "talismanic test" and cautioning that attenuation doctrine depends on the circumstances of each case).

The *Strieff* Court found that the temporal proximity between the illegal stop and the search at issue—only minutes—favored suppressing the evidence. 136 S. Ct. at 2062. But the Court found that the presence of intervening circumstances—including the discovery of the valid arrest warrant—strongly favored not suppressing the evidence. 136 S. Ct. at 2062-63. As for the third factor, the Court found that Fackrell's conduct was not flagrant and did not seek to serve an improper purpose. 136 S. Ct. at 2063. The Court reasoned that because the exclusionary rule is meant to deter police misconduct, invoking that rule in this instance would serve little purpose where, as the Court interpreted it, Fackrell simply made some "good-faith mistakes" in illegally stopping Strieff and his conduct thereafter was lawful. 136 S. Ct. at 2063. Moreover, the Court found there was no evidence that Fackrell's behavior in stopping Strieff was part of a systemic pattern of police misconduct. 136 S. Ct. at 2063. The Court held the evidence

"was admissible because the unlawful stop was sufficiently attenuated by the pre-existing arrest warrant. Although the illegal stop was close in time to Strieff's arrest, that

17

consideration is outweighed by two factors supporting the State. The outstanding arrest warrant for Strieff's arrest is a critical intervening circumstance that is wholly independent of the illegal stop. The discovery of that warrant broke the causal chain between the unconstitutional stop and the discovery of evidence by compelling Officer Fackrell to arrest Strieff. And, it is especially significant that there is no evidence that Officer Fackrell's illegal stop reflected flagrantly unlawful police misconduct." 136 S. Ct. at 2063.

Although the facts in *Strieff* and *Moralez* are distinguishable, the Court's decision in *Strieff* abrogates that part of the Kansas Supreme Court's holding in *Moralez* that the subsequent discovery of a warrant is of "minimal importance" in attenuating the taint from an illegal detention upon evidence discovered during a search incident to an arrest on the warrant. See *Moralez*, 297 Kan. at 415. But the remainder of the holdings and conclusions of law on other issues in *Moralez* remain in effect.

We now turn to the district court's analysis of the attenuation doctrine in Manwarren's case. Here, the district court distinguished *Strieff*, finding that the officer in that case was involved in "a bona fide investigation of a suspected drug house" when the illegal detention occurred. On appeal, the State correctly points out that the *Strieff* Court drew no distinction between "bona fide" and non-"bona fide" investigations in terms of applying the attenuation doctrine. But we do not interpret the district court's order as trying to distinguish between bona fide investigations and non-bona fide investigations. Instead, we interpret the district court's order as trying to distinguish between stops that are investigatory—such as the one in *Strieff*—and stops that are not investigatory, such as voluntary encounters or public safety stops. In that regard, we agree with the district court that *Strieff* is materially distinguishable from Manwarren's case because it did not implicate a welfare check or public safety stop but rather involved an unfounded investigatory detention as the result of the officer's good-faith mistakes.

18

In rejecting the application of the attenuation doctrine in Manwarren's case, the district court found that the "time elapsed between the illegality and the acquisition of the evidence was negligible." The district court also found that Rivers "did discover an outstanding warrant, an intervening circumstance dissipating the taint of the illegal police contact." But it does not appear that the district court expressly addressed the purpose and flagrancy of the police misconduct. The district court ultimately found that the "State has failed to sustain the burden of proving that the attenuation doctrine should be applied."

Whether attenuation sufficiently purged the taint of illegal police conduct is a question of fact that appellate courts review under a substantial competent evidence standard. *Moralez*, 297 Kan. at 410. But in Manwarren's case, where the evidence on the issue is undisputed, we can employ de novo review. See *Hanke*, 307 Kan. at 827. The burden is on the State to show that the attenuation doctrine should be applied to allow the admission of the evidence. See K.S.A. 22-3216(2) (the burden of proving that the search and seizure were lawful shall be on the prosecution).

*Application of the attenuation doctrine to Manwarren's case*

The first factor generally considered by courts in an analysis under the attenuation doctrine is the "temporal proximity" between the unconstitutional conduct and the discovery of the evidence. *Strieff*, 136 S. Ct. at 2062. Here, the time span between Manwarren's illegal detention and the discovery of the evidence during the search incident to his arrest was not long, which weighs in favor of suppression.

The second factor that guides a court's analysis of whether the attenuation doctrine applies is the presence of any intervening circumstances. *Strieff*, 136 S. Ct. at 2062. As the district court found, Rivers discovered that Manwarren had active warrants, an intervening circumstance dissipating the taint of the illegal police contact. But for the reasons already stated, the genesis of this encounter as a welfare check and the complete

19

lack of any justification for the investigation into whether Manwarren had outstanding warrants materially distinguish this case from *Strieff*. Thus, although the existence of the outstanding warrants should not be minimized and certainly weighs against suppression, it is not controlling here just because it appeared to be controlling in *Strieff*.

The third factor that guides a court's analysis of whether the attenuation doctrine applies is the "purpose and flagrancy of the official misconduct." *Strieff*, 136 S. Ct. at 2062. In *Strieff*, the Supreme Court emphasized that "[f]or the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." 136 S. Ct. at 2064. The Kansas Supreme Court has stated that in examining the flagrancy of official misconduct, "'[f]actors such as an officer's regular practices and routines, an officer's reason for initiating the encounter, the clarity of the law forbidding the illegal conduct, and the objective appearance of consent may all be important in this inquiry.'" *Moralez*, 297 Kan. at 416.

Here, Rivers was polite and courteous throughout his encounter with Manwarren. It appears that Rivers did not subjectively understand that he was violating Manwarren's constitutional rights. But his conduct of running a warrant check as part of a welfare stop is clearly in violation of well-established Kansas caselaw, going back to *Vistuba* in 1992, which emphasizes that a public safety or welfare stop is *not* for investigative purposes and must end as soon as the officer determines the citizen is not in need of help. See *Vistuba*, 251 Kan. at 824; *Gonzales*, 36 Kan. App. 2d at 457. Thus, the clarity of Kansas law forbidding Rivers' illegal conduct supports a finding of flagrant official misconduct.

Moreover, Rivers testified that, based on his training, he runs a warrant check every time he has a public encounter with any citizen. He testified that his understanding of departmental policy was: "If we, you know, make contact with anybody out there, we get their name and date of birth, check for warrants." Rivers later confirmed that when making contact with a pedestrian, "I identify the people I'm speaking with, so that way I

20

know who I'm speaking with. And, yes, when I do identify them . . . I do run them." Later, when asked whether it was his "understanding you can walk up to somebody and take their I.D. and run them for wants and warrants," Rivers responded, "Yes." He also agreed that he "routinely follow[s] that procedure."

Contrary to the district court's finding that there was "no evidence to suggest the unlawful detention was part of any systemic or recurrent police misconduct," we find that the evidence in the record supports the opposite conclusion. Rivers testified that he believes it is constitutionally permissible to take a person's identification and check for warrants in any public encounter with any citizen, and he does so in every case. While this understanding may be correct when the encounter is an investigatory detention, it is not the case for a public safety stop based on well-established Kansas law. Unlike the misconduct of the police officer in *Strieff*, Rivers' misconduct cannot be characterized as a good-faith mistake, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence. Instead, it is misconduct in need of deterrence and, as such, justifies applying the exclusionary rule.

Here, when Rivers discovered that Manwarren had an active warrant, he had an obligation to arrest him. He also had the right to conduct a safety search incident to the arrest. But it does not follow that any evidence seized during the search is admissible in a later prosecution of Manwarren based on the evidence found during the search. When the running of the warrant check is what makes the detention illegal in the first place, it stands to reason that the discovery of the warrant alone will not always attenuate the illegal police conduct. Otherwise, the end will always justify the means.

To sum up, in applying the public safety rationale to justify a police-citizen encounter, courts employ careful scrutiny "so the protections of the Fourth Amendment are not emasculated." *Gonzales*, 36 Kan. App. 2d at 455. The State argues that the United States Supreme Court's decision in *Strieff* stands for the proposition "that the discovery of

21

an outstanding warrant attenuates any taint of an otherwise illegal detention." But the Court's decision in *Strieff* does not go that far. Here, the district court's finding that the State failed to meet its burden of proving that the attenuation doctrine should be applied is supported by substantial evidence in the record. As a result, we conclude the district court did not err in granting Manwarren's motion to suppress the evidence.

Affirmed.