No. 120,046

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

SHELBIE ELLIS,
*Appellant.*

SYLLABUS BY THE COURT

1.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 15 of the Kansas Constitution Bill of Rights provides the same protection from unlawful government searches and seizures as the Fourth Amendment.

2.

Whenever an officer interacts with a person in a public place, the rights protected by the Fourth Amendment are tested. The legal principles applied to safeguard those rights vary depending on the type of interaction that takes place. Kansas courts have recognized four such interactions: (1) voluntary encounters; (2) investigatory detentions; (3) welfare checks or public-safety stops; and (4) arrests.

3.

An officer's authority to conduct welfare checks or public-safety stops is not based on a suspicion of criminal activity, but rather a need to check on a person's health or confirm the safety of a situation.

4.

This court uses a three-part test to define the contours of a valid welfare check: First, an officer has the right to stop or investigate when there are objective, specific, and articulable facts to suspect that a person needs help or is in peril. Second, if the person needs help, the officer may take the appropriate steps to render assistance. And third, when the officer believes that the person is no longer in need of assistance, any further actions constitute a seizure.

5.

The exclusionary rule is based on deterrence. To justify the exclusion of unlawfully seized evidence, law enforcement's conduct must be sufficiently deliberate so exclusion can meaningfully deter it and sufficiently culpable so the deterrence is worth the price paid by the justice system in excluding the evidence.

6.

There is no bright-line rule defining when the attenuation doctrine applies to admit evidence that would normally be suppressed. Instead, courts consider various factors, including the temporal proximity between the unlawful conduct and the discovery of the evidence in question; the presence of intervening circumstances (such as the discovery of a warrant); and the purposes and flagrancy of the official misconduct.

7.

Although the existence of an outstanding warrant is certainly a factor weighing against suppression of evidence under the attenuation doctrine, that factor is not controlling in every case. Instead, the discovery of the warrant must be considered in the context of the other factors in the attenuation analysis.

8.

The third factor in the attenuation analysis—the purpose and flagrancy of the official misconduct—is perhaps the most critical because it focuses on the primary purpose of the exclusionary rule: deterring police misconduct. To assess the purpose of the misconduct, Kansas courts look at factors such as an officer's regular practices and routines, an officer's reason for initiating the encounter, the clarity of the law forbidding the illegal conduct, and the objective appearance of consent.

Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed November 15, 2019. Reversed and remanded with directions.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Laura L. Miser*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., HILL and WARNER, JJ.

WARNER, J.: This case originates from a welfare check conducted by Emporia police officers at a local convenience store. The officers were called to check on Shelbie Ellis after she had been in the women's restroom for an extended duration. After the police talked to Ellis and determined she did not need assistance, an officer asked for her driver's license and called in a records check for warrants—even though he had no suspicion of criminal activity. The officers subsequently discovered Ellis had an outstanding warrant in Rice County. When they arrested her, the officers found methamphetamine and a pipe in her purse.

Ellis was convicted of possession of methamphetamine and possession of paraphernalia after the district court denied her motion to suppress the seized evidence. She challenges the denial of that motion on appeal, arguing the records check (as well as

the officer's retaining her license and asking her several investigatory questions) violated her right under the United States and Kansas Constitutions to be free from unlawful searches and seizures. And she asserts that the evidence seized in this case must be excluded in order to deter such unlawful conduct and safeguard the constitutional rights at stake. We agree and therefore reverse Ellis' convictions and remand to the district court with directions to suppress the evidence in question.

FACTUAL BACKGROUND

The facts in this case are not disputed. On January 20, 2018, employees at an Emporia convenience store called the local police department because a female customer had been in the bathroom for 45 minutes and was found in a stall on her hands and knees. The employees asked the police to find out if she was okay.

Officer William Kent of the Emporia Police Department went to the store to conduct a public-welfare check. Officer Kent later acknowledged that the purpose of his visit was to ensure the woman's well-being, not to investigate any criminal activity. When he arrived, the officer spoke to the employees and then went to the women's restroom. He knocked on the bathroom door, opened it, and asked the woman if she was all right. The woman responded that she was having stomach issues. A second officer, Officer Eric Law, arrived at the scene to assist Officer Kent.

While standing in the doorway of the bathroom, Officer Kent asked the woman if she could come out of the stall so he could speak to her and visually ensure her well-being. He did not ask if she needed medical attention. The woman complied and exited the stall.

When she emerged, Officer Kent asked for the woman's driver's license so he could provide her identity to his dispatcher. Officer Kent later testified that he did not

4

suspect any criminal activity at this time. She again complied with the officer's request and handed over her license, which identified her as Ellis. In her subsequent testimony, Ellis stated she believed she could have refused to give Officer Kent her license but saw no reason to do so. She also stated that once the police had her license, she did not feel free to leave.

Though he had not indicated that he would use the license for any reason except to check her identity, Officer Kent immediately provided Ellis' license number to police dispatch to run a records check for wants and warrants. He then kept Ellis' license and began to ask her questions—where she was from and where she was going—even though he admitted in his testimony later that he still had no suspicion of criminal activity. Ellis told him that she was not from the area, that she was travelling to Michigan, and that her ride was waiting for her outside.

Officer Kent asked Ellis to accompany him to the parking lot and to identify her ride. The car was no longer in the parking lot, so Officer Kent asked Ellis to call the driver and have him come back to the store. She attempted to call, and then text, the driver. As Ellis was texting, Officer Kent noticed that her hands were shaking and asked if she had done any drugs that day. She acknowledged that her hands were shaking but denied using any drugs. Officer Kent then asked her if he could search her purse; Ellis responded, "Please don't."

Officer Kent continued to ask her questions. A few minutes later, dispatch alerted the officers to a potential warrant for Ellis out of Rice County. Upon receiving this information, Officer Kent asked Ellis if she had been using drugs in the bathroom. She responded that she would never take drugs in a public restroom, but she admitted she had methamphetamine in her purse. Officer Kent handcuffed Ellis, read her *Miranda* rights, put her in the back of his squad car, and placed her purse on the hood of the vehicle. He continued questioning Ellis about what she was doing in Emporia and commented that it

5

was strange for her ride to leave her at the convenience store. Shortly thereafter, dispatch confirmed the Rice County warrant. Officer Kent searched the purse, finding a bag of methamphetamine and a pipe.

Despite Ellis' shaking hands, Officer Kent noted she was lucid and coherent throughout the encounter. The entire interaction—from the bathroom stall to the search of her purse—lasted between 5 and 10 minutes.

The State charged Ellis with possession of methamphetamine and possession of drug paraphernalia. Ellis moved to suppress the evidence, arguing Officer Kent exceeded the scope of the welfare check by retaining her license and checking for warrants after concluding that she was not in need of assistance. The State argued that the encounter was a valid stop, that Ellis provided her license voluntarily, and that even if the detention was unlawful, the discovery of the Rice County warrant rendered the evidence admissible under *Utah v. Strieff*, 579 U.S. __, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016).

The district court denied Ellis' motion. The court found there was "nothing wrong with [the] particular interaction" between Officer Kent and Ellis, and that Ellis "voluntarily gave" her license to the officers. The court ruled that "once the officer has [the driver's license], he's free to check [the National Crime Investigation Center (NCIC)] to determine if there's—if she's a wanted person or if there's some other thing, a runaway or something like that that she might need some services and that sort of thing." And the court concluded that after he initiates the records search, "the officer . . . can detain her until that's determined and continue to ask her, not necessarily to arrest her, because they're still in the investigatory stage, but ask questions." Finally, the court concluded that even if the officer's conduct was improper, the discovery of the Rice County warrant independently justified the arrest under *Strieff*.

Ellis filed a motion to reconsider, urging the court to find that the officer's conduct exceeded the scope of a welfare check under *State v. Messner*, 55 Kan. App. 2d 630, 419 P.3d 642 (2018). When the court denied her motion, Ellis proceeded to a bench trial based on the stipulated testimony from the suppression hearing. The court found Ellis guilty on both counts. She now appeals.

DISCUSSION

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment's Due Process Clause, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 15 of the Kansas Constitution Bill of Rights provides "the same protection from unlawful government searches and seizures as the Fourth Amendment." *State v. Daniel*, 291 Kan. 490, 498, 242 P.3d 1186 (2010).

Whenever an officer interacts with a person in a public place, the rights protected by the Fourth Amendment are tested. The legal principles applied to safeguard those rights vary depending on the type of interaction that takes place. *State v. Manwarren*, 56 Kan. App. 2d 939, 945-46, 440 P.3d 606, *rev. denied* 310 Kan. __ (September 11, 2019). Kansas courts have recognized four such interactions: (1) voluntary encounters; (2) investigatory detentions; (3) welfare checks or public-safety stops; and (4) arrests. *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016).

To deter violations of the Fourth Amendment by law enforcement, courts hearing criminal cases exclude—or suppress—evidence found as a result of an unlawful search or seizure. *Strieff*, 136 S. Ct. at 2061. This exclusion applies both to "'primary evidence obtained as a direct result of an illegal search or seizure'" and to "'evidence later discovered and found to be derivative of an illegality.'" 136 S. Ct. at 2061 (quoting *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 82 L. Ed. 2d 599 [1984]).

7

Although courts generally refer to this practice as the exclusionary "rule," the Supreme Court has recently emphasized that it is a judicially created remedy and only applies when "'its deterrence benefits outweigh its substantial social costs.'" *Strieff*, 136 S. Ct. at 2061 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L. Ed. 2d 56 [2006]). In other words, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009).

We review the factual underpinnings of a district court's decision on a motion to suppress evidence for substantial competent evidence and its ultimate legal conclusion de novo. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014). When the material facts are not in dispute—as here—whether evidence should be suppressed is a question of law over which our review is unlimited. *State v. Stevenson*, 299 Kan. 53, 57-58, 321 P.3d 754 (2014). Although a defendant initiates a constitutional challenge to a search or seizure by filing a motion to suppress the evidence in question, the State has the burden to prove any challenged police conduct was permissible. *Cleverly*, 305 Kan. at 605.

1. *The officer's conduct here exceeded the permissible scope of the welfare check.*

Ellis argues that the district court erred in finding that Officer Kent could retain her license and check for outstanding warrants after he concluded she was not in need of assistance. She asserts that no reasonable person would feel free to leave while a police officer was still in possession of his or her license under these circumstances and that the officer's conduct exceeded the permissible scope of a welfare check. The State counters that the officer's actions were reasonable, particularly since Ellis voluntarily gave Officer Kent her license when he asked for it.

8

As a preliminary matter, both the State and Ellis agree that Officer Kent's encounter with Ellis was a welfare check. Welfare checks—which are constitutionally analogous to public-safety stops—fall under law enforcement's community-caretaking function. These encounters occur when an officer checks on a person's welfare for safety or assistance reasons. *State v. Vistuba*, 251 Kan. 821, 824, 840 P.2d 511 (1992), *disapproved of on other grounds by State v. Field*, 252 Kan. 657, 847 P.2d 1280 (1993). A welfare check "is *not* for investigative purposes." *State v. Gonzales*, 36 Kan. App. 2d 446, 457, 141 P.3d 501 (2006). Rather, it must be "'divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Messner*, 55 Kan. App. 2d at 637.

Kansas courts employ careful scrutiny when applying this public-safety rationale to ensure that the protections of the Fourth Amendment are not rendered meaningless. *Gonzales*, 36 Kan. App. 2d at 455. This court uses a three-part test to define the contours of a valid welfare check: First, an officer has the right to stop or investigate when there are objective, specific, and articulable facts to suspect that a person needs help or is in peril. Second, if the person needs help, the officer may take the appropriate steps to render assistance. And third, when the officer believes that the person is no longer in need of assistance, any further actions constitute a seizure. 36 Kan. App. 2d at 456. These considerations differentiate welfare checks and public-safety stops—which are performed under law enforcement's caretaking function—from investigative detentions and arrests based on reasonable suspicion or probable cause of criminal activity.

Here, Officer Kent acknowledged in his testimony that he had no articulable reason to suspect Ellis of any criminal activity throughout their encounter until he learned there was a possible warrant for her arrest and she admitted she had drugs in her purse. The question before us is whether the officer's continued detention of Ellis after he had determined she did not need help exceeded the scope of the permissible encounter and therefore violated the Fourth Amendment. We conclude it did.

9

Kansas and federal courts have recognized that a law enforcement officer may "obtain a person's identification and check for outstanding warrants when the officer has reasonable suspicion to detain and investigate the person for criminal activity"—that is, to conduct an *investigatory detention*. *Manwarren*, 56 Kan. App. 2d at 948. The same is true as part of an officer's investigation of a routine traffic infraction. *State v. Jimenez*, 308 Kan. 315, 325, 420 P.3d 464 (2018). In such instances, an officer has reasonable suspicion to believe that the detained person has engaged in illegal conduct, and the officer is therefore "free to check the person for outstanding warrants as part of the investigation." *Manwarren*, 56 Kan. App. 2d at 948.

This court has held on multiple occasions, however, that an officer goes beyond the permissible scope of a *welfare check or public-safety stop* by retaining a person's identification and running a records check for wants and warrants. See *Manwarren*, 56 Kan. App. 2d at 948-49; *Messner*, 55 Kan. App. 2d at 637; *Gonzales*, 36 Kan. App. 2d at 458. This is because an officer's authority to conduct welfare checks and safety stops is not based on a suspicion of criminal activity, but rather a need to check on a person's health or confirm the safety of a situation. Once an officer determines the person is not in need of assistance, the welfare check ends. Any further action constitutes an investigatory detention. See *Manwarren*, 56 Kan. App. 2d at 949; *Messner*, 55 Kan. App. 2d at 637.

This distinction between investigatory detentions, on the one hand, and welfare checks and voluntary encounters, on the other, is rooted in the practical realities of such interactions and the structural concerns surrounding the Fourth Amendment's protections. Practically speaking, when an officer retains a person's identification in order to run a records check for warrants, he or she is no longer looking into the person's wellbeing, but rather is investigating potential criminal activity. And when the officer exceeds the scope of the welfare check or safety stop, the encounter becomes an investigatory detention. *Gonzales*, 36 Kan. App. 2d at 458. Courts have found the same to be true for voluntary

encounters when an officer runs a records check without a person's consent. See *State v. Grace*, 28 Kan. App. 2d 452, 458, 17 P.3d 951 (2001). For the Fourth Amendment to provide meaningful protection in these circumstances, officers' authority to conduct a welfare check or safety stop must be limited to the circumstances originally permitting that encounter, lest officers use community caretaking as "a pretext for an investigative stop when there is no reasonable suspicion or probable cause." *Gonzales*, 36 Kan. App. 2d at 458.

In this case, Officer Kent went to the convenience store to check on Ellis' welfare, not to investigate criminal conduct. The appropriate scope of his inquiry was to see if Ellis needed help and, if so, to take necessary steps to render assistance. See *Gonzales*, 36 Kan. App. 2d at 456. When Officer Kent located Ellis in the bathroom, she told him that she was having stomach issues. When Ellis exited the bathroom stall at the officer's request, he found she was coherent, able to walk, and did not appear to need any medical assistance. Officer Kent testified that at this point the purpose of the welfare check had been fulfilled.

The nature of the interaction then changed. Officer Kent, still standing at the door of the women's restroom, did not ask Ellis if she needed medical assistance and took no further steps to check on her welfare. Instead, he asked for her identification and called dispatch to check for any outstanding warrants. The officer asked Ellis what she was doing in the store, where she was coming from, who her ride was, and whether she had been doing drugs in the bathroom. These questions were entirely unrelated to the initial welfare check but rather constituted investigative fishing—unmoored, as Officer Kent himself admitted, to any articulable suspicion of criminal activity—until dispatch was able to report the outcome of the warrant search.

We find that the officer's actions exceeded the scope of the authorized welfare check. And while courts have recognized that these interactions may evolve from one

type of permissible encounter to another—such as from a voluntary encounter to an investigatory detention—that did not occur here.

Notably, the State does not argue on appeal that Officer Kent had reasonable suspicion to conduct a criminal investigation of Ellis before he learned of her outstanding warrant. Rather, the State asserts—and the district court found in its denial of the motion to suppress—that because Ellis agreed to provide her driver's license to Officer Kent, the encounter going forward was voluntary and consensual. We disagree.

Ellis agreed to give the officer her license, but she never agreed to his using that license to check for outstanding warrants. The mere providing of identification does not give law enforcement carte blanche to conduct an otherwise unlawful investigation. Nor does it relieve law enforcement of the constitutional necessity of a reasonable and articulable suspicion before such an investigation is permitted. See *Manwarren*, 56 Kan. App. 2d at 949. Once Officer Kent had Ellis' license in his possession, we conclude—as did this court in *Gonzales*, *Messner*, and *Manwarren*—that no reasonable person would have felt herself free to leave. This was not a voluntary encounter but an investigatory detention unsupported by reasonable suspicion or probable cause.

The State also argues that requesting a records check does not necessarily render the encounter an investigatory detention because records checks provide officers useful information other than whether a person is wanted by law enforcement or has an outstanding warrant. Officer Kent testified that he routinely runs records checks during safety stops to ensure his safety and to see whether the person has been reported missing, has absconded from a mental health facility, or is otherwise listed in the FBI's NCIC.

We recognize there may be circumstances where a records check could be warranted, even in a welfare check or public-safety stop, if the purpose of the encounter were to investigate one of those details. But the State does not argue that the officers here

12

had any reason to believe Ellis was a missing person or had left a mental health facility. The law does not permit the State to use the information potentially available from NCIC to rationalize an otherwise unlawful search or seizure.

Officer Kent's investigatory detention of Ellis exceeded the scope of the welfare check—the only constitutionally authorized encounter in this case. As such, the encounter violated Ellis' rights under the federal and Kansas Constitutions.

2. *The evidence found as a result of the officer's unlawful detention was not sufficiently attenuated from the unlawful detention to render it admissible. Thus, the evidence must be suppressed.*

We have concluded that the police conduct in this case violated the Fourth Amendment and Section 15 of the Kansas Constitution Bill of Rights. The evidence gleaned from that detention—the information Officer Kent learned from dispatch regarding Ellis' warrant, her statements in response to the officer's questions regarding drugs, and items found when he searched her purse during the subsequent arrest—was gained through the officer's unlawful conduct. This evidence should therefore have been suppressed, and thus excluded from Ellis' criminal trial, unless an exception to the exclusionary rule applies.

The exclusionary rule is based on deterrence. To justify the exclusion of unlawfully seized evidence, law enforcement's conduct must be "sufficiently deliberate that exclusion can meaningfully deter it" and "sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. For this reason, the Supreme Court has held that tainted evidence need not be suppressed when "the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Strieff*, 136 S. Ct. at 2061. In such cases, "'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" 136 S. Ct. at 2061 (quoting

13

*Hudson*, 547 U.S. at 593); see *State v. Williams*, 297 Kan. 370, 381, 300 P.3d 1072 (2013). Courts describe this principle as the attenuation doctrine.

There is no bright-line rule defining when the attenuation doctrine applies. Instead, courts consider various factors, including the temporal proximity between the unlawful conduct and the discovery of the evidence in question; the presence of intervening circumstances (such as the discovery of a warrant); and the purposes and flagrancy of the official misconduct. *Strieff*, 136 S. Ct. at 2061-63; *Manwarren*, 56 Kan. App. 2d at 952. No one factor is controlling, and other considerations may be relevant to the attenuation doctrine analysis. See *Brown v. Illinois*, 422 U.S. 590, 603, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (declining to adopt any "talismanic test" and cautioning that the attenuation doctrine depends on the circumstances of each case). The State bears the burden of demonstrating the evidence is sufficiently removed from the illegal activity to permit its admissibility. *Cleverly*, 305 Kan. at 611.

The district court found that the evidence against Ellis was still admissible, even if the encounter was unlawful, because the discovery of the Rice County warrant attenuated her arrest (and the subsequent search of her purse) from the officer's illegal conduct. We do not agree and find the court erred in denying Ellis' motion to suppress.

The evidence in question is not sufficiently attenuated from the officer's unlawful conduct to render it admissible. The time between Officer Kent's unlawful extension of the original welfare check by initiating the records check and the discovery of the warrant was minimal. And while *Strieff* found the discovery of a warrant to be an intervening circumstance that attenuated the officers' unlawful conduct there, see 136 S. Ct. at 2061-62, we do not reach the same conclusion under these facts.

In *Manwarren*, this court distinguished *Strieff*, noting the Utah police in that case were conducting an investigatory detention, not a public-safety stop. *Manwarren*, 56

14

Kan. App. 2d at 955. And we reasoned that although the existence of the outstanding warrant is certainly a factor weighing against suppression, that factor is "not controlling" in every case. 56 Kan. App. 2d at 955. Particularly when "the running of the warrant check" is one of the actions that "makes the detention illegal in the first place, it stands to reason that the discovery of the warrant alone will not always attenuate the illegal police misconduct. Otherwise, the end will always justify the means." 56 Kan. App. 2d at 956. Thus, the warrant must be considered in the context of the other factors in the attenuation analysis.

Our Kansas Supreme Court recently observed that the third factor in the analysis, the purpose and flagrancy of the official misconduct, is "perhaps the most critical" because it "focuses on the primary purpose of the exclusionary rule—deterring police misconduct." *State v. Sanders*, 310 Kan. 279, 300, 445 P.3d 1144 (2019). To assess the purpose of the misconduct, Kansas courts look at "'[f]actors such as an officer's regular practices and routines, an officer's reason for initiating the encounter, the clarity of the law forbidding the illegal conduct, and the objective appearance of consent.'" *Manwarren*, 56 Kan. App. 2d at 955. "For the violation to be flagrant, more severe police conduct is required than the mere absence of proper cause for the seizure." *Strieff*, 136 S. Ct. at 2064.

Although *Strieff* found there were no facts in that case to demonstrate an improper purpose for the police misconduct, 136 S. Ct. at 2063, we find the third factor in the attenuation analysis weighs in favor of suppression here. As in *Manwarren*, the officers' standard procedure of running a records check for warrants as part of a safety stop violated well-established Kansas caselaw, which "emphasizes that a public safety stop or welfare stop is *not* for investigative purposes and must end as soon as the officer determines the citizen is not in need of help." 56 Kan. App. 2d at 955. Officer Kent testified that he routinely engages in such conduct and retains the person's license until the records check is done. Officer Law, who was also at the scene, testified that he also

15

asks for identification and runs a records check during public-safety stops and welfare checks as well.

Officer Kent testified that the initial purpose of his encounter with Ellis—the welfare check—was accomplished before he provided her license number to dispatch. And although the State posits several reasons why running a records check on a license might help determine whether a person needs assistance, none of those reasons could apply after the purpose of the welfare check was completed. Rather, we find these explanations to be after-the-fact efforts to justify conduct that Kansas courts have long held to be unconstitutional.

The arguments presented in this appeal illustrate the critical role the exclusionary rule plays in informing law enforcement's conduct. During oral argument, the State posited that it was permissible for police to walk up to any person on the street and ask for identification—and that once such identification is provided, officers should be free to run a check for warrants and other records. This position cannot be reconciled with Kansas law, which recognizes that a records check is an investigatory action. Thus, such conduct is only permissible if an officer has a reasonable, articulable explanation for conducting the investigation or if the person providing identification otherwise consents. The exclusionary rule is the primary judicial tool to correct such misunderstandings and deter officers from engaging in unlawful conduct in the future, and it applies here.

In short, the State has not demonstrated that the attenuation doctrine should apply in this case. Rather, the totality of the circumstances here warrant excluding the evidence gained as a result of the officer's unlawful detention of Ellis. The district court erred by denying the motion to suppress.

Reversed and remanded with directions.