IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,046

STATE OF KANSAS
*Appellee*,

v.

SHELBIE ELLIS,
*Appellant*.

SYLLABUS BY THE COURT

1.

A law enforcement officer who has available objective, specific, and articulable facts creating a suspicion that an individual needs help or is in peril may stop and investigate the situation.

2.

If an individual has been stopped subsequent to a legitimate suspicion that she or he needs aid, the officer may take appropriate action to render assistance.

3.

Once the officer is assured that an individual is not in peril or is no longer in need of assistance, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment to the United States Constitution.

1

4.

A law enforcement officer's mere request for identification or identifying information generally will not constitute a seizure.

5.

The nature of a police-citizen encounter can change, and what may begin as a consensual encounter can transform into an investigative detention if the police conduct changes.

6.

Police may not lawfully extend a welfare check by running a warrant check on an individual who is the subject of the check unless some other circumstances support prolonging the check and converting it into a detention.

7.

Under the attenuation doctrine, the poisonous taint of an unlawful search or seizure may dissipate when the connection between unlawful police conduct and challenged evidence becomes attenuated.

8.

The State bears the burden of establishing sufficient attenuation to purge the taint of an illegal search or seizure and avoid application of the exclusionary rule.

9.

To demonstrate that the taint of an illegal seizure has dissipated, the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the

causal connection between the illegal detention and the discovery of incriminating evidence.

10.

The development of probable cause to arrest an individual, after a police officer's discovery of evidence of a crime when the officer has illegally detained an individual, does not attenuate the taint of an illegal seizure and allow admission of evidence obtained in a later search.

11.

Probable cause flowing directly from an unlawful seizure does not break the causal connection between the Fourth Amendment violation and a search and is therefore not an intervening circumstance.

12.

Once a law enforcement officer has legal grounds to conduct an investigatory detention, the officer is free to check an individual for outstanding warrants as part of the investigation. If a warrant is discovered, then an arrest may follow and evidence consequent to the arrest is admissible.

Review of the judgment of the Court of Appeals in 57 Kan. App. 2d 477, 453 P.3d 882 (2019). Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed August 7, 2020. Judgment of the Court of Appeals reversing the district court is affirmed. Judgment of the district court is reversed, and the case is remanded to the district court with directions.

*Rick Kittel,* of Kansas Appellate Defender Office, was on the briefs for appellant.

3

*Laura L. Miser*, assistant county attorney, and *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.:  Shelbie Ellis appeals from the denial of her motion to suppress evidence relating to possessing drugs and from her subsequent conviction. The Court of Appeals reversed, and this court granted the State's petition for review.

FACTUAL AND PROCEDURAL HISTORY

On the afternoon of January 20, 2018, an employee of a Casey's General Store in Emporia called in a police report that a woman had been in a store restroom stall for about 45 minutes and had been seen at one point on her hands and knees. Police officers Eric Law and William Kent were dispatched to the store for a welfare check, with Kent arriving at the scene first. The employee told Kent that the woman had told her she was "fine."

According to Officer Kent's affidavit, he went to the restroom door, knocked, and announced, "Police department." He told the woman the business staff was concerned about her being in the restroom for so long and had asked the police to check on her. According to Kent, the woman replied "she was feeling well and asked if she needed to come out." Kent asked her to step out so he "could see if she was ok." She told him "she had stomach issues due to her eating something."

4

Kent asked to see her driver's license, and he identified her as Shelbie Ellis. He held onto her license and placed a call to dispatch asking them to run the license information for possible outstanding warrants. Ellis told Kent that she and a friend were on their way to Michigan from Stafford, Kansas. She said that her friend was waiting in the car for her.

Kent directed her to step outside the store to see whether the friend was still around, and at about this time Officer Law arrived at the scene. Ellis walked around to the south of the building and then said the friend must have left, probably trying to find characters for a mobile Pokémon game. Kent then directed Ellis to call the friend to come get her. While this was going on, Kent received a report from the police dispatcher that Ellis had a possible outstanding warrant from Rice County, Kansas, for a probation violation.

As Ellis was attempting to call her friend, Kent observed her hands shaking. He asked her if she had been using drugs that day. She said that she had not but she was aware her hands were shaking. Kent then asked her if he could search her bag for drugs. She replied, "Please don't." He followed up by asking what she had been doing in the restroom. She replied, "I would never use drugs in a public restroom, but I do have drugs in my purse. I have meth and a pipe in my purse."

After Ellis finally contacted the driver and asked him to come back for her, based on a confirmation of the warrant report from the dispatcher, Kent placed her in handcuffs and read her her *Miranda* rights. He escorted Ellis to the back of his patrol car and then searched her wallet, where he found a clear plastic baggie containing a crystalline substance. In her makeup bag, he found a glass pipe wrapped inside two stockings. He then transported her to the county jail, where

5

she was confined on the outstanding warrant and the pending drug charges. A field kit gave a positive test for methamphetamine for the crystalline substance and residue in the glass pipe.

On January 22, 2018, the State filed a complaint charging Ellis with one count of possession of methamphetamine and one count of possessing drug paraphernalia. Through counsel, Ellis filed a motion to suppress, arguing that the seizure and subsequent search exceeded the scope of the encounter. The State filed a response, arguing that the attenuation doctrine set out in *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016), legitimized the seizure.

Following an evidentiary hearing, the district court denied the motion to suppress. The court also denied a motion to reconsider. Ellis elected to go to a trial before the bench, where she again objected to the introduction of the drug evidence. The court found her guilty of both counts. On August 15, 2018, the court sentenced her to a standard term of 13 months of incarceration with 12 months of postrelease supervision for the methamphetamine charge and a concurrent term of 6 months for the paraphernalia charge. The court then placed her on probation for a period of 18 months. She took a timely appeal to the Court of Appeals.

The panel of the Court of Appeals unanimously reversed, holding that the investigatory detention exceeded the scope of the welfare check and the evidence obtained as a result should have been suppressed. *State v. Ellis*, 57 Kan. App. 2d 477, 489-90, 453 P.3d 882 (2019). This court granted the State's petition for review and noted Ellis' response.

The State urges this court to decide that the Court of Appeals either ignored or misunderstood the attenuation doctrine, which states that, following a legitimate seizure, the discovery of a valid arrest warrant legitimizes further detention and consequent searches. For the reasons set out below, we disagree with the position that the State advocates.

ANALYSIS

When a party appeals a ruling based on the attenuation doctrine, the appellate court considers questions of fact that it reviews to determine whether the facts are supported by substantial competent evidence. The appellate court then reviews the district court's ultimate legal conclusion de novo. *State v. Christian*, 310 Kan. 229, 235, 445 P.3d 183 (2019); see *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018) (general standard of review for reviewing district court decision on motion to suppress).

We will initially address whether Officer Kent lawfully engaged with Ellis and requested her identification and will conclude that he did. We will then address whether Kent lawfully detained Ellis and will conclude that he did not. Finally, we will address whether the attenuation doctrine mitigates the unlawful detention and will conclude that it does not. We will conclude that the Court of Appeals correctly held that the evidence used against Ellis should have been suppressed.

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Section 15 of

the Kansas Constitution Bill of Rights contains similar language and provides "the same protection from unlawful government searches and seizures as the Fourth Amendment." See *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014).

This court first recognized the concept of a public safety stop in *State v. Vistuba*, 251 Kan. 821, 840 P.2d 511 (1992), *disapproved in part on other grounds by State v. Field*, 252 Kan. 657, 847 P.2d 1280 (1993). In that case, the officer testified that she observed erratic driving and was concerned that the driver might be impaired, but the officer specifically stated that she suspected no criminal activity from her observations. The Supreme Court determined the stop was lawful and held: "[A] civil or criminal infraction is not always essential to justify a vehicle stop. Safety reasons alone may justify the stop, *if the safety reasons are based on specific and articulable facts*." 251 Kan. at 824.

In *State v. Gonzalez*, 36 Kan. App. 2d 446, 456, 141 P.3d 501 (2006), the Court of Appeals adopted a three-part test to determine the legality of a public safety stop. First, as long as there are objective, specific, and articulable facts from which an experienced law enforcement officer would suspect that a citizen needs help or is in peril, the officer has the right to stop and investigate. Second, if the citizen needs aid, the officer may take appropriate action to render assistance. Third, once the officer is assured that the citizen is not in peril or is no longer in need of assistance, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment. This court has never adopted the *Gonzalez* test, but, in *State v. Marx*, 289 Kan. 657, 662-64, 215 P.3d 601 (2009), we discussed the test without expressly applying, adopting, or rejecting it. We deem the *Gonzalez* test appropriate in analyzing the legality of the search in the present case.

8

While not a vehicle stop, Kent's contact with Ellis was justified by safety reasons based on specific and articulable facts. The testimony was uncontroverted that Kent initiated his contact with Ellis in response to a store employee's concerns for Ellis' health or safety. Ellis had spent an unusually long time in the restroom and had been observed on her hands and knees on the floor. When he arrived, Kent inquired whether she was all right, consistent with an investigation into her wellbeing. Ellis replied that she was feeling generally well but was dealing with some digestive issues. This interaction was lawful.

Kent did not stop with the welfare inquiry; he proceeded to ask Ellis for identification. This was also lawful. This court has held that a law enforcement officer's mere request for identification or identifying information generally will not constitute a seizure. See *State v. Pollman*, 286 Kan. 881, 888, 190 P.3d 234 (2008). Kent viewed Ellis' license and determined that she was who she purported to be and was not a minor or using false identification. At this time, the welfare check had been completed. The officer's actions up to this point were lawful.

The nature of a police-citizen encounter can change, however, and what may begin as a welfare check can transform into an investigative detention if the police conduct changes. See, e.g., *Pollman*, 286 Kan. at 888-89 (voluntary encounter); *City of Topeka v. Grabauskas*, 33 Kan. App. 2d 210, 99 P.3d 1125 (2004) (community caretaking function).

The evidence is compelling that Kent unlawfully detained Ellis. He kept her driver's license, he escorted her out of the restroom and out of the store, and he directed her to place calls for a ride. This was clearly more than a welfare check; she reasonably would have felt she was being subject to a criminal investigation and she was not free to

9

leave. Her testimony at the hearing on the motion to suppress was that she did not feel free to leave after she handed Kent her license and she was not free to ask for her license back.

In *Pollman*, we held that an officer's retention of an identification card is one factor to be considered in applying the totality of the circumstances test for whether an interaction was consensual, and, without offsetting circumstances, that factor may mean a reasonable person would not feel free to leave or otherwise terminate an encounter with the officer. 286 Kan. at 889. Here, there were no apparent offsetting circumstances that might have led Ellis to believe she was free to end the contact with Kent.

Furthermore, the presence of more than one officer increases the coerciveness of an encounter, and, although the presence of two uniformed and armed officers does not automatically transform every police-citizen encounter into a nonconsensual one, it is a relevant factor for courts to consider in determining whether a citizen's interaction with law enforcement is consensual. *United States v. Hernandez*, 847 F.3d 1257, 1266 (10th Cir. 2017). Officer Law arrived while Kent was escorting Ellis out of the store, and the presence of two police officers for what was supposed to be a welfare check on a possibly ill customer would certainly have given Ellis reason to believe she was being detained and was not free to leave.

In order for an officer to go beyond a voluntary encounter or a public safety check and detain a person for further investigation, the officer must have "'reasonable suspicion the seized individual is committing, has committed, or is about to commit a crime or traffic infraction. [Citations omitted.]'" *State v. Chapman*, 305 Kan. 365, 370, 381 P.3d 458 (2016).

10

This case does not involve a traffic stop, but it involves the scope of an investigation and warrant check that the police may undertake when they have no indication of criminal activity of a particular individual. In that respect, it resembles the circumstances in *State v. Damm*, 246 Kan. 220, 787 P.2d 1185 (1990), where this court reviewed evidence produced following a vehicle stop after an officer observed its taillights were defective. After he stopped the car, the officer demanded identification from the driver and his two passengers. The check on one of the passengers revealed an outstanding arrest warrant, whereupon the officer arrested the passenger and then searched the car. The search turned up drugs and related paraphernalia, and the officer arrested all three occupants. This court suppressed the evidence, holding:

> "The officer in this case had no reasonable suspicion that there were outstanding warrants for the passengers. He had no report of the commission of a crime, saw nothing within the car which would indicate to him that the occupants had committed any offense, and had no reasonable justification for requiring identification of the passengers and running record checks on them. The seizure of the three occupants of the vehicle while 'routine record checks' were made of all occupants was unreasonable.

> "Without the unreasonable detention, the officer had no reason to arrest [the passengers or the driver]. Without the arrest, there could be no search. Without the search, there was no evidence against [the defendant driver]. The detention and search being unlawful, the evidence is inadmissible as fruit of the poisonous tree. [Citations omitted.]" 246 Kan. at 224-25.

Our caselaw makes it clear that police may not lawfully extend a welfare check by running a warrant check on an individual who is the subject of the check unless some other circumstances support prolonging the check and converting it into a detention.

11

Here, Kent had no reasonable suspicion that Ellis was committing, had committed, or was about to commit a crime. Kent testified that he saw no evidence of criminal activity and that Ellis assured him that she was not in need of assistance. Kent nevertheless retained her license and placed a call to dispatch for the express purpose of extending his investigation into whether she had any outstanding warrants. He directed her to go outside and call for someone to pick her up, and he interrogated her about drug use and told her he wanted to search her belongings. All of these activities broke the chain of lawful conduct that began when he responded to a welfare call.

The district court judge in the present case, however, attached no importance to Kent retaining Ellis' license after he confirmed that she was in no danger or in need of medical attention. The judge declared that, once Ellis handed him her identification, Kent was free to perform a record check on her. At the hearing on Ellis' motion to reconsider, the judge went further, saying that Kent "cajoled her out of the bathroom" and there was nothing unlawful about then checking to see if she "had some pick up order or something."

In light of the holdings of this court and the Court of Appeals, the district court's understanding of the law was incorrect. Checking to see if Ellis "had some pick up order" exceeded the scope of the safety check. It was completely unnecessary to serve the purpose for which Kent was dispatched, and it converted the stop into an investigatory stop and search without reasonable suspicion of criminal activity.

Having determined that Kent's conduct constituted an unlawful seizure and consequent search, we next consider whether the evidence should have been suppressed.

12

Suppression results from applying the exclusionary rule under which a court may suppress the "primary evidence obtained as a direct result of an illegal search or seizure" and "evidence later discovered and found to be derivative of an illegality"—the so-called "'fruit of the poisonous tree'"—if it finds officers obtained evidence in violation of the Fourth Amendment. *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984); see *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (explaining fruit of the poisonous tree doctrine); *State v. Deffenbaugh*, 216 Kan. 593, 598, 533 P.2d 1328 (1975) (same).

But "'the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons.'" *Brown v. Illinois*, 422 U.S. 590, 600, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 38 L. Ed. 2d 561 [1974]); see *Christian*, 310 Kan. at 235.

The exclusionary doctrine has four major exceptions:  (1) when police acted in "good faith" reliance on legal authority, such as warrants, statutes, or caselaw; (2) when subsequent information was gathered from a source independent of the poisoned tree; (3) when the information would have been inevitably discovered, regardless of the illegality; or (4) when there has been sufficient attenuation between the illegality and the discovery of the evidence such that the taint of the illegality has been dissipated. *Herring v. United States*, 555 U.S. 135, 142-44, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (good faith); *Murray v. United States*, 487 U.S. 533, 537, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988) (independent source); *Nix v. Williams*, 467 U.S. 431, 443-44, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984) (inevitable discovery); *Hudson v. Michigan*, 547 U.S. 586, 593, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006) (attenuation doctrine).

13

It is upon the last of these exceptions that the State seeks to hang its hat in this case. It argues that the discovery of an outstanding warrant attenuated the illegality of the detention and legitimized arresting Ellis and subsequently searching her, resulting in the discovery of drugs and paraphernalia.

Under the attenuation doctrine, the poisonous taint of an unlawful search or seizure dissipates when the connection between the unlawful police conduct and the challenged evidence becomes attenuated. *State v. Jefferson*, 297 Kan. 1151, 1162, 310 P.3d 331 (2013). The State bears the burden of establishing sufficient attenuation to purge the taint of an illegal search or seizure and avoid application of the exclusionary rule. To demonstrate that the taint of an illegal seizure has dissipated, the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the conduct leading to the discovery of incriminating evidence. See *Jefferson*, 297 Kan. at 1162.

In *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016), the United States Supreme Court explored and further explained the attenuation doctrine. Strieff involved a police-citizen encounter that was an investigatory detention from the outset. While conducting intermittent surveillance of a residence identified in an anonymous tip about drug activity, a police officer observed the defendant leave the residence. Believing there was reasonable suspicion that the defendant was involved in criminal activity, the officer stopped him in a nearby parking lot. The officer obtained his identification, checked with the dispatcher, and learned of an outstanding arrest warrant for the defendant. The officer arrested him and searched him, finding drugs and drug paraphernalia.

14

In the resulting criminal proceedings, the defendant moved to suppress the evidence, arguing that the police officer lacked reasonable suspicion for the stop. The district court denied the motion, finding that the existence of a valid arrest warrant sufficiently attenuated the connection between the stop and the discovery of the contraband. The Utah Court of Appeals affirmed, but the Utah Supreme Court reversed, holding that only a defendant's voluntary act could sufficiently break the connection between an illegal search and evidence subsequently discovered. The United States Supreme Court granted certiorari to apply the attenuation doctrine to the facts of the case, assuming without deciding that the initial stop was unconstitutional.

The *Strieff* Court held that an officer's discovery of a valid, preexisting arrest warrant attenuated the connection between an unlawful investigatory stop and drug-related evidence seized from the defendant during a search incident to arrest. 136 S. Ct. at 2062-63. Under this doctrine, evidence obtained through an unconstitutional seizure is admissible if the connection between the unconstitutional police conduct and the discovery of the evidence is remote or has been sufficiently interrupted by an intervening circumstance, so long as the police did not commit the misconduct purposefully or flagrantly. Particularly relevant to our present case is that, in *Strieff*, the stop was made consequent to a bona fide criminal investigation. This court recognized and applied *Strieff* in *State v. Tatro*, 310 Kan. 263, 445 P.3d 173 (2019), and *Christian*, 310 Kan. 229.

The State in the present case urges this court to apply the attenuation doctrine as articulated in *Strieff* to preserve the admissibility of the seized evidence. The State complains that a recent line of cases from this court and the Court of Appeals essentially eviscerates the attenuation doctrine. Despite the State's passionate argument, we conclude that the facts of this case render application of the attenuation doctrine inappropriate.

15

No bright-line rule defines when the attenuation doctrine applies. Courts must, instead, examine the facts of each case to determine whether the circumstances attenuate the taint of illegality. *Christian*, 310 Kan. at 235.

The *Strieff* Court identified three nonexclusive factors for determining whether the attenuation doctrine applies. First, courts look to the temporal proximity between the unconstitutional conduct and the discovery of incriminating evidence to determine how closely the discovery of the evidence was linked to the unconstitutional seizure. Second, courts consider intervening circumstances. Third, courts examine the purpose and flagrancy of the official misconduct. No single factor is controlling, and other factors may also be relevant to the analysis. See *Strieff*, 236 S. Ct. at 2062; *Christian*, 310 Kan. 229, Syl. ¶ 5.

We now apply the three *Strieff* factors to the facts of the present case. It should be noted that the district court made no ruling on attenuation or the *Strieff* factors, instead deciding that Kent's conduct was completely lawful and they had a right to run Ellis' license to see if she "had some pick up order or something."

a.  *Temporal proximity*

This factor tends to support suppression. Kent testified that the encounter outside the store lasted "a few minutes," or "[a]round five minutes." Law confirmed Kent's testimony that no more than 10 minutes elapsed between the encounter at the store bathroom and the warrant confirmation and arrest.

A finding of attenuation is not generally appropriate unless significant time elapses between an unlawful act and when law enforcement obtains the evidence.

16

*Christian*, 310 Kan. 229, Syl. ¶ 6. In *Strieff*, the Supreme Court held that the temporal factor does not favor attenuation unless "'substantial time'" elapses between an unlawful act and when the evidence is obtained, and the passage of only "minutes" "counsels in favor of suppression." 136 S. Ct. at 2062. The Court cited to *Brown v. Illinois*, 422 U.S. 590, 604-05, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), where a time interval of "less than two hours" separated the unconstitutional arrest and the resulting incriminating statement, and the short time interval was a factor supporting suppression.

Here, the time lapse was, at most, 10 minutes. In fact, the district court, in ruling against suppression, found it was "a very short period of time" between the detention and the receipt of the incriminating warrant information. The passage of so little time weighs heavily in favor of suppression in this case.

b. *Intervening circumstances*

This factor, at first blush, weighs heavily in favor of the State.

The discovery of an arrest warrant can be an intervening factor that "strongly favors the State." See *Strieff*, 136 S. Ct. at 2062. To a significant degree, it is the preexisting nature of the warrant that attenuates the taint of the unconstitutional seizure. *Tatro*, 310 Kan. at 272. The *Strieff* Court explained that a warrant is a judicial mandate requiring that an officer conduct a search or make an arrest, and the officer has a duty to carry out its provisions. 136 S. Ct. at 2062. This means that a valid warrant that is unconnected to the stop independently compels the officer to make an arrest, and that officer does not exercise discretion in executing the order.

17

The problem for the State in the present case is that Kent was already engaging in an unconstitutional criminal investigation of Ellis before he received information about the possible warrant. He continued to exercise control over her, escorting her (or, in the words of the district court, "cajol[ing] her") outside the store and directing her to call for her ride, before the warrant was confirmed. Under the State's theory, police could approach random people on the street, demand their identification cards, and run warrant checks on them. If no warrant came up, then the detainee would be released—no harm, no foul. If a warrant came up, then the warrant would attenuate the unconstitutional stop and justify arrests and searches incident thereto. The police could routinely carry out criminal investigatory detentions of all citizens without risking suppression of discovered evidence.

We specifically commented on this undesirable result in *State v. Moralez*, 297 Kan. 397, 415, 300 P.3d 1090 (2013). While *Strieff* abrogated a portion of *Moralez* that held the discovery of a preexisting warrant carries little weight when applying the attenuation doctrine, *Strieff* did not abrogate the other portions of *Moralez*. See *State v. Sanders*, 310 Kan. 279, Syl. ¶ 13, 445 P.3d 1144 (2019).

This court has held that the development of probable cause to arrest after a police officer's discovery of evidence of a crime when the officer has illegally detained an individual does not attenuate the taint of an illegal seizure and allow admission of evidence obtained in a later search. The probable cause flows directly from the unlawful seizure and does not break the causal connection between the Fourth Amendment violation and the search. Probable cause developed in such a way is, therefore, not an intervening circumstance. *Christian*, 310 Kan. 229, Syl. ¶ 7.

18

In *Christian*, the Court of Appeals held that the initial investigatory stop was not justified based on reasonable suspicion. *State v. Christian*, No. 116,133, 2017 WL 3947406, at *8 (Kan. App. 2019) (unpublished opinion). Because the State did not cross-petition for review of that holding, the issue was not before this court and the case was decided with the understanding that the initial detention and subsequent arrest were unlawful. 310 Kan. at 234.

We held that detaining the defendant for an expired tag and arresting him for no proof of insurance were not ministerial acts consistent with the officer's duty to carry out the provisions of an arrest warrant. They were, instead, discretionary acts carried out in the officer's investigatory law enforcement role. *Christian*, 310 Kan. at 238. The grounds for detaining the defendant arose from and were directly related to the unlawful initial detention. 310 Kan. at 238. "Discovering evidence of a crime when that discovery flows directly from the unconstitutional seizure does not attenuate the taint of the Fourth Amendment violation." 310 Kan. at 239.

Under *Christian*, *Tatro*, and *Moralez*, the discovery of an outstanding warrant was not an attenuating factor in this case. Kent was detaining Ellis and conducting an unreasonable criminal investigation of her before the so-called attenuating factor came into play. The discovery of a warrant under these circumstances does not satisfy the second factor of *Strieff*, an attenuating intervening circumstance.

   c.  *Purpose and flagrancy of police misconduct*

It has been the clearly stated law of this state since at least 1992 that public safety or welfare checks based on specific and articulable facts are distinct from stops based on reasonable suspicion of criminal activity. See, e.g., *Vistuba,* 251 Kan. at 824. Our

19

appellate courts have repeatedly held that a public safety check must end upon a determination that the individual who has been stopped is not in need of assistance.

Whether purposeful or flagrant misconduct weighs in favor of suppression turns on multiple considerations, including whether the officer acted in good faith, committed multiple unconstitutional acts following the unconstitutional seizure, or acted as part of a systemic and recurrent pattern of police misconduct. The officer's subjective state of mind weighs heavily in evaluating good faith. Courts will generally find purposeful and flagrant misconduct if the impropriety of the official's misconduct was obvious or the official knew at the time that his or her conduct was likely unconstitutional but nevertheless carried it out and if "the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." *Christian*, 310 Kan. 229, Syl. ¶ 8; see *Tatro*, 310 Kan. 263, Syl. ¶ 8; *State v. Cleverly*, 305 Kan. 598, 612, 385 P.3d 512 (2016).

Kent testified that his sole purpose for going to the women's restroom at the store was a welfare check; there was no information suggesting criminal activity. Ellis told Kent she was having stomach issues. He testified that he had no information suggesting that her behavior was the result of anything other than stomach issues. He testified that he never asked her whether she needed medical assistance, and he didn't know if he asked her whether she needed an ambulance. He took her driver's license immediately after she emerged from the bathroom stall. He testified that she was able to walk and she did not appear to be suffering from any critical medical situations. He acknowledged that the welfare check had been satisfied by the time he took her license.

Kent openly conceded that the purpose of requesting her identification was to transform the check into a criminal investigation. Kent asked her for her driver's license

20

"so I could run it, so I could let my dispatch know who I was talking to." He had no indication of criminal activity at that time. He asked her to go outside with him to see if the driver of a silver car he had seen in the parking lot was the person who gave her a ride, and he kept possession of her driver's license during that time. Although he did not physically restrain her while he waited with her by the parking lot, he retained the license.

Kent did not receive the information of a possible Rice County warrant until after he had taken her driver's license, walked her outside, directed her to call her ride to come for her, and asked to search her purse. It was only after he was informed of the possible warrant that he asked her whether she was using drugs in the restroom and learned from her that she had drugs in her purse. He allowed her to finish her telephone call for a ride and then placed her in handcuffs. He then received a dispatch confirming the warrant.

Testimony by the arresting officers at both the suppression hearing and the trial revealed that their transformation of a safety check into a criminal investigatory detention was "part of a systemic and recurrent pattern." See *Christian*, 310 Kan. 229, Syl. ¶ 8.

Kent testified that it was standard procedure in his department to keep the driver's licenses of people whom he is called to assist for welfare checks so that he can run warrant checks. Law testified that officers in his department don't always ask to see a license when investigating a welfare call because "sometimes it's not necessary." He offered no explanation why it would have been considered "necessary" in this case. He confirmed that Ellis was not dressed in a fashion conducive to concealing a weapon and she took no action that led either officer to believe that she would attempt to harm them.

21

Kent's decision to run a warrant check as part of a welfare stop violated well-established Kansas caselaw, going back to *Damm* in 1990 and *Vistuba* in 1992, which emphasized that a public safety or welfare stop is not for investigative purposes and must end as soon as the officer determines the citizen is not in need of help. See *Vistuba*, 251 Kan. at 824; *Damm*, 246 Kan. at 224-25; *Gonzalez*, 36 Kan. App. 2d at 457. The clarity of Kansas law forbidding Kent's illegal conduct supports a finding of flagrant official misconduct. Furthermore, Kent testified that running identification cards pursuant to safety checks was his standard practice. Routinely engaging in constitutionally forbidden conduct does not convert that conduct into permissible police activity. See *State v. Manwarren*, 56 Kan. App. 2d 939, 956, 440 P.3d 606, *rev. denied* 310 Kan. 1068 (2019).

We conclude that all three *Strieff* factors weigh against admissibility of the drug evidence under the attenuation doctrine.

We acknowledge the position of the concurring opinion, but we note that the three *Strieff* factors do not necessarily exist independent of one another. Temporal proximity, the discovery of an arrest warrant, and the flagrancy of the police misconduct may be intertwined and considered together. Flagrant misconduct and the presence of an intervening factor may bear on each other, as the Eighth Circuit Court of Appeals suggested in *United States v. Lowry*, 935 F.3d 638, 644 (8th Cir. 2019):

> "But *Strieff* did not announce a *per se* rule that the discovery of a warrant would always vitiate subsequent searches. Whether it is characterized as a part of the second element of the attenuation test (that the intervening event be unconnected to the purpose for the stop) or as a part of the third element of the attenuation test (that the officer not have a flagrant or unconstitutional purpose), *Strieff* instructs that we should decline to find attenuation where there is evidence that the police officer was engaged in a fishing expedition for old warrants. [Citation omitted.]"

22

In the present case, unlike the circumstances in *Strieff* and *Tatro*, the police-citizen contact began, not as part of a criminal investigation or suspicion of criminal activity, but as a public welfare check. These facts substantially distinguish this case from the others. The discovery of the warrant occurred after the flagrantly unlawful detention disguised as a welfare check, and we conclude that, in such a circumstance, the warrant was not an intervening factor favoring the State in this case.

The State complains that decisions by the Court of Appeals and this court have so attenuated the attenuation doctrine that it has no room for operation in Kansas. This is not the situation.

Unlike in a public safety stop, which is not for investigative purposes, it is constitutionally permissible for a law enforcement officer to obtain a person's identification and check for outstanding warrants when the officer has reasonable suspicion to detain and investigate the person for criminal activity. See *State v. Walker*, 292 Kan. 1, 14-16, 251 P.3d 618 (2011). Likewise, as part of the routine investigation of a traffic infraction, the officer has a right to check the driver's license, inspect the vehicle's registration and proof of insurance, and determine whether there are outstanding warrants against the driver. *State v. Jimenez*, 308 Kan. 315, 325, 420 P.3d 464 (2018). And, of course, if the public safety stop had in itself given Kent grounds to form a reasonable suspicion that Ellis had engaged or was engaging in criminal activity, he could have lawfully expanded the scope of the check into a criminal investigation, including a warrant check.

In other words, once an officer has legal grounds to conduct an investigatory detention, the officer is free to check the person for outstanding warrants as part of the investigation. If a warrant is discovered, then, as the Supreme Court pointed out in *Strieff*,

an arrest may follow and evidence consequent to the arrest is admissible. 136 S. Ct. at 2062 (once police discover warrant, have obligation to arrest detainee); see *United States v. Leon*, 468 U.S. 897, 920 n.21, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) ("'A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.'").

Despite repeated admonitions to the State that police may not use public welfare checks as a basis for conducting background investigations and warrant checks for citizens who may exhibit need for medical attention or police help, such conduct persists. Our caselaw stands firmly against police detaining citizens and seizing their driver's licenses when there is no indication that the citizens have engaged in criminal conduct. See *Chapman*, 305 Kan. at 370; *Moralez*, 297 Kan. at 415; *Vistuba*, 251 Kan. at 824; *Damm*, 246 Kan. 224-25; *Manwarren*, 56 Kan. App. 2d at 949-50; *State v. Messner*, 55 Kan. App. 2d 630, 636, 419 P.3d 642 (2018); *State v. Griffith*, No. 120,794, 2020 WL 399070, at *13-14 (Kan. App. 2020) (unpublished opinion); *State v. Bluthardt*, No. 116,401, 2017 WL 948330, at *3 (Kan. App. 2017) (unpublished opinion); cf. *State v. McKenna*, 57 Kan. App. 2d 731, 735-40, 459 P.3d 1274, 1278-80 (2020), *petition for rev. filed* March 2, 2020 (applying same analytic structure as other cases but finding particular facts of case justified retaining defendant's license and running warrant check).

It may appear to be a harsh result to suppress evidence when arrest warrants are readily available to police and when the evidence would certainly come to light after a valid arrest. But here, as in several Court of Appeals decisions, it was unlawful police conduct that led to the discovery of the warrant, and suppression is the long-standing remedy for illegal government seizure and searches.

24

We, therefore, affirm the Court of Appeals decision reversing the district court. The judgment of the district court is reversed, and the evidence seized subsequent to the initial contact must be suppressed. The case is remanded for further proceedings.

MICHAEL E. WARD, Senior Judge, assigned.[1]

* * *

STEGALL, J., concurring:  I concur with the result we reach today, but write separately to note that the majority appears to back away from the more stringent requirements of *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016). I would instead stick to our application of *Strieff* as outlined in *State v. Tatro*, 310 Kan. 263, 445 P.3d 173 (2019). In *Tatro*, we made it clear that the United States Supreme Court had found that the discovery of a preexisting valid warrant is always an intervening circumstance which effectively renders the first, temporal prong of the attenuation test irrelevant, and which will always supersede the exclusionary rule unless the police misconduct was purposeful or flagrant. See *Tatro*, 310 Kan. at 265, 273 ("[A] court may admit evidence obtained as a result of an unconstitutional seizure if the connection between the unconstitutional police conduct and the discovery of the evidence is remote

_____

[1]**REPORTER'S NOTE:**  Senior Judge Ward was appointed to hear case No. 120,046 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

25

or has been sufficiently interrupted by an intervening circumstance, as long as the police did not commit the misconduct purposefully or flagrantly. . . . [And] a preexisting, valid, and untainted arrest warrant presents an intervening circumstance.").

Thus, under both *Strieff* and *Tatro*, when a preexisting valid warrant is discovered, the only question remaining is whether the unconstitutional conduct was purposeful or flagrant. Here, I agree with the majority that it was flagrant misconduct. But I would limit the analysis in these circumstances to that question only.

LUCKERT, C.J., and WILSON, J., join the foregoing concurring opinion.